NEMETH v ABONMARCHE DEVELOPMENT, INC

Docket No. 106747. Argued December 10, 1997 (Calendar No. 12).
    Decided April 21, 1998.

Theodore W. Nemeth and other residents of Manistee brought an
    action in the Manistee Circuit Court against Abonmarche Develop-
    ment, Inc., other developers of a marina, condominium, and hotel
    project at the mouth of the Manistee River, and the city of Manis-
    tee. The plaintiffs alleged that violation by the developers of the
    soil erosion and sedimentation control act, MCL 324.9101 *et seq.*;
    MSA 13A.9101 *et seq.*, provided sufficient evidence that their activi-
    ties violated Michigan's environmental protection act, MCL
    324.1701 *et seq.*; MSA 13A.1701 *et seq.*, either by polluting, impair-
    ing, or destroying air, water, or other natural resources, or were
    likely to do so. The court, James M. Batzer, J., issued a preliminary
    injunction against the defendants, proscribing excavation and
    movement of soil in the project area until proper permits were
    issued by a soil erosion control officer who was independent of the
    city's operational control. The injunction did not affect the city.
    Thereafter, the court granted the plaintiffs' motion for a permanent
    injunction, and subsequently entered a final judgment, awarding
    attorney fees and costs to the plaintiffs pursuant to the MEPA
    against the developers, but not the city. The Court of Appeals, SAAD,
    P.J., and BANDSTRA and M. G. HARRISON, JJ., reversed in an unpub-
    lished opinion per curiam, holding that an injunction based on an
    MEPA violation was not warranted because the activity of the
    defendants did not rise to such a level of impairment or destruction
    of a natural resource so as to constitute an environmental risk. The
    Court further held that the resource in question—sand—was easily
    replaceable and its movement would not have any significant con-
    sequential effect on other natural resources. Finally, the Court
    vacated the award of attorney fees and costs (Docket No. 159861).
    The plaintiffs appeal.

    In an opinion by Justice BRICKLEY, joined by Chief Justice
    MALLETT, and Justices BOYLE and TAYLOR, the Supreme Court *held*:

    Violations of the soil erosion and sedimentation control act can
    form the basis of a prima facie case under Michigan's environmen-
    tal protection act. The environmental protection act does not per-

mit a trial judge to apportion attorney fees as costs in such an action.

1. Under the SESCA, an earth change is defined as a human-made change in the natural cover or topography of land activities that may result in or contribute to soil erosion or sedimentation of the waters of the state. Rules promulgated by the DNR pursuant to the SESCA provide that a landowner or developer who contemplates an earth change within five hundred feet of a lake or stream must obtain a permit from the appropriate enforcing agency before commencement. In addition, a soil erosion and sedimentation control plan must be submitted, reviewed, and approved before applying for a permit. When a permit applicant has met all the requirements of the rules and the SESCA, the enforcing agency must issue a permit for the proposed earth change. It is not disputed that defendants violated the SESCA and the rules promulgated pursuant to it.

2. The MEPA does not require air, water, or other natural resources to be scarce or unique to be protected from actual or likely pollution, impairment, or destruction. Each alleged MEPA violation must be evaluated by the trial court using the pollution control standard appropriate to the particular alleged violation. It is proper for the trial court to independently determine whether these pollution control standards are valid, applicable, and reasonable in accordance with the development of the common law of environmental quality. If the trial court finds them deficient, it may direct the adoption of another pollution control standard that it approves and specifies. SESCA violations can establish a prima facie case under MEPA, provided that the trial judge has deemed the SESCA standards appropriate, applicable, and reasonable. In this case, the trial court found the SESCA and the rules promulgated under it to be valid, applicable, and reasonable pollution control standards by which to evaluate the plaintiffs' MEPA claim and the defendants' conduct.

3. Attorney fees are not ordinarily recoverable unless a statute, court rule, or common-law exception provides the contrary. The MEPA does not permit a trial judge to apportion attorney fees. While the MEPA mandate that Michigan courts develop the common law of environmental quality gives the courts discretion in developing the substantive law, it does not provide discretion with regard to the apportionment of costs. The language of the statute is clear and unambiguous. Costs apportioned in an MEPA action do not include attorney fees.

Justice WEAVER concurred only in the result.

Affirmed in part and reversed in part.

Justice CAVANAGH, joined by Justice KELLY, concurring in part and dissenting in part, stated that attorney fees are apportionable in MEPA actions as the interests of justice require. The majority's conclusion to the contrary in effect will serve to constrain the application of the act and thereby frustrate its purpose.

The Legislature allowed costs in MEPA actions to be apportioned to the parties if the interests of justice require. In addition, since the enactment of the MEPA, a host of remedial environmental statutes have been enacted that allow for the apportionment of attorney fees. If the progeny of the MEPA are to provide for attorney fees, it follows that the statute that began this entire area of law would also allow them. MEPA actions often are protracted and technical proceedings whose cost would be prohibitive to most persons. To expect that the MEPA will be utilized by individuals to protect the environment at private expense is to ignore the reality of litigation today.

*Philip R. Rosi,* and *Olson, Noonan, Ursu & Ringsmuth, P.C.* (by *James M. Olson* and *Christopher M. Bzdok*), for the plaintiffs-appellants.

*Sullivan, Crowley & Beeby, P.C.* (by *George W. Beeby*), for defendants-appellees Abonmarche Development, Inc.

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *Thomas G. Herman*) for defendant-appellee city of Manistee.

*Cross, Wrock, P.C.* (by *Jack O. Kalmink*), for defendant-appellee Morren Construction & Engineering, Inc.

*Smith, Haughey, Rice & Roegge* (by *Jon D. Vander Ploeg*) for defendant-appellee MacLean Construction Company.

Amicus Curiae:

*Rentrop, Vanderkloot, Haynes & Morrison, P.C.* (by *Jeffrey K. Haynes* and *C. Thomas Ludden*), for Michigan Environmental Council.

BRICKLEY, J.

I

We are called upon to decide two issues in this case. First, we must determine whether violations of the soil erosion and sedimentation control act, MCL 324.9101 *et seq.*; MSA 13A.9101 *et seq.* (SESCA), can form the basis of a prima facie case under the Michigan environmental protection act, MCL 324.1701 *et seq.*; MSA 13A.1701 *et seq.* (MEPA). We conclude that it can and, therefore, reverse in part the decision of the Court of Appeals and reinstate in part the judgment of the trial court. Secondly, we must determine whether the MEPA permits a trial judge to apportion attorney fees in the "interests of justice." We conclude that it does not and, therefore, affirm in part the decision of the Court of Appeals.

II

In the fall of 1990, defendant developers[1] began construction of a multimillion-dollar marina, condominium, and hotel project at the mouth of the Manistee River, on the shore of Lake Michigan, on property owned by defendant city of Manistee. Construction involved stripping the vegetation and topsoil from thirty acres of barrier dunes, digging a marina basin, and moving thousands of cubic yards of earth into

---

[1] Abonmarche Development, Inc., Abonmarche Consultants, Inc., Morren Construction & Engineering, Inc., and MacLean Construction, Inc.

piles on the edges of the construction site. In December of 1990, after this phase of the construction took place, a storm struck Manistee, and wind and water on the exposed dunes carried sand, snow, fly ash, and other sediments from the construction site to the surrounding area. The sediments buried nearby parcels in drifts several feet deep, destroyed window casings, damaged siding, and were blown into the interiors of homes in the area.

Nine months later, a group of residents sued the developers and the city of Manistee. Plaintiffs[2] had several theories of recovery; however, only the allegation of a violation of the MEPA is before this Court. Plaintiffs argued that the developers' violations of the SESCA provided sufficient evidence that the developers' activities violated the MEPA by either polluting, impairing, destroying air, water, or other natural resources, or were likely to do so. See subsection 1703(1).

The trial court issued a preliminary injunction against defendants on February 28, 1992, nunc pro tunc from December 7, 1991, enjoining excavation of soil and movement of soil in the project area. Neither the construction on the building sites nor the earthmoving activities where the defendants were trying to establish joinder of the Manistee River with the marina basin were enjoined. The trial judge made findings of fact on which he based his grant of the preliminary injunction. First, the court found that the severity of the storm that occurred in 1990 was due to the stripping of the vegetative cover of the project

---

[2] Theodore W. Nemeth, Winifred A. Nemeth, Jon C. Falk, Peggy Falk, Art Anderson, Wilma Anderson, and Wayne Hansen.

area. The trial court also found that there was "demonstrated indifference" in the past to proper soil erosion control measures by defendants, on the basis of the failure to implement soil erosion control recommendations resulting from the consultations between the city soil erosion officer and the county soil erosion control officer.

However, this demonstrated indifference underwent significant change through the course of the litigation. In December of 1991, at the behest of the trial court, the city took steps to put in place a soil erosion control officer—independent of the city's operational control. Before the independent officer's insistence, no soil erosion control plan had been submitted by defendants that met the SESCA's requirements.

That officer also issued a cease and desist order, insisting that certain measures be taken before any work could continue on the site. Upon issuance of that order, the developers took immediate steps to conform to the requirements and "lay down this material to hopefully hold the soil in place until a proper mulch cover . . . and grass cover [could] be put in place." The trial court specifically noted that there was no cover before this because the developers' efforts in 1991 were not done in a timely fashion; therefore, the mulch and grass cover they attempted to put in was not able to take hold in a manner sufficient to meet the requirements of the SESCA.

The trial court was satisfied that plaintiffs had established a likelihood of prevailing on the merits; that is, they were harmed by the alleged violations of the environmental statutes. The trial court, in weighing the harm to plaintiffs and the cost to defendant

developers,[3] held that the cost of compliance with the injunction was minimal because the project was not "shut down."

The trial court ruled that the preliminary injunction would last until the proper permits by the independent soil erosion control officer were issued because the prior permits were not valid since the permits were not supported by an adequate soil erosion control plan. All that really remained to be done, according to the trial court, was for the developers to apply for the permits and the soil erosion control officer to make his independent evaluation regarding whether the permits should be issued. The injunction did not affect the city of Manistee.

The trial court granted plaintiffs' motion for a permanent injunction on October 27, 1992, and issued its final judgment and order on November 24, 1992. The final judgment and order provided that defendants were permanently enjoined as follows:

---

[3] Strictly speaking, in determining whether to issue an injunction with respect to a claim under the MEPA, the trial judge should determine the appropriateness of such relief, temporary or permanent, or whether conditions should be imposed on the defendant to protect a natural resource from pollution, impairment, or destruction. See subsection 1704(1). However, in this case, the final judgment was based on alternative theories of recovery. The judgment provided that plaintiffs' claims under all counts of the complaint for property damage seeking monetary awards, claims of zoning violations, and mandamus claims (count I-negligence, count II-nuisance, count III-nuisance per se, count IV-declaratory judgment and injunction to abate public nuisance, count V-declaratory judgment and preliminary injunction based on the SESCA, count VI-MEPA declaratory judgment, preliminary and permanent injunctions) were dismissed with prejudice by agreement of the parties. The final judgment also provided that plaintiffs' claims under the MEPA, in combination with the SESCA, and, alternatively, under trespass and nuisance theories seeking injunctive relief, were decided in plaintiffs' favor by the trial judge. This alternative basis for the injunction explains the trial court's balancing analysis.

(1) Enjoined nunc pro tunc, from December 7, 1991, until the issuance of proper soil erosion control permits, from performing any construction activities which include and involve movement of soil. This injunction to exclude solely (a) minor movements of soil for the continuing construction of building sites and (b) earth moving in the area where Defendants are attempting to establish a joinder of the marina basin with the Manistee River, i.e., at the "River site."

(2) Mandatorily enjoined and directed to the same extent and scope of any cease and desist order and/or directive from the Independent Soil Erosion Control Officer, subject to Defendants' right to an administrative appeal from such order or directive and limited by any reversal or modification or other change thereof on such an appeal, and subject to Defendants' concurrent right to challenge in this Court the propriety and scope of such Officer's order or directive.

Finally, the trial court awarded attorney fees and costs to plaintiffs, pursuant to the MEPA, in the amount of $89,377 against defendants, Abonmarche, Morren, and MacLean, but not against the city of Manistee.

The Court of Appeals, in an unpublished opinion per curiam, held that an injunction based on a violation of the MEPA was not warranted because the activity of defendants did not "rise to such a level of impairment or destruction of a natural resource so as to constitute an environmental risk," relying on *Dafter Sanitary Landfill v Superior Sanitation Service*, 198 Mich App 499; 499 NW2d 383 (1993). Slip op, p 2. Moreover, held the Court of Appeals, the natural resource in question—sand—and its location, was not rare, unique, endangered, or of historical significance. *Id.* Finally, the Court of Appeals held that sand is easily replaceable and that the movement of sand in that area would not have any significant consequential effect on other natural resources.

III

The first issue we are called on to decide in this case is whether the trial court properly held that plaintiffs established that defendants violated the MEPA by showing that defendants violated the SESCA. Subsection 1703(1) of the MEPA provides:

When the plaintiff in the action has made a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction. Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts apply to actions brought under this part.

At the center of this controversy is the proper application of our decision interpreting the MEPA in *Ray v Mason Co Drain Comm'r*, 393 Mich 294; 224 NW2d 883 (1975). Plaintiffs argue that the low threshold of harm required by the MEPA and *Ray* has been chipped away by the lower court's imposition of additional requirements. Defendants argue that a violation of the SESCA cannot, by itself, amount to a violation of the MEPA.

First, we must reiterate exactly what is required by *Ray*. We held that the "judicial development of a common law of environmental quality, as envisioned by the Legislature, can only take place if circuit court

judges take care to set out with specificity the factual findings upon which they base their ultimate conclusions." *Ray, supra* at 307. We further observed that the MEPA itself provides substantial guidance to trial judges regarding what should be included in the findings of fact for actions brought under the MEPA. See subsection 1703(1).

The trial judge must find facts on which the plaintiff claims to have made a prima facie case under the MEPA, that is, what conduct of the defendant "has or is likely to pollute, impair or destroy the air, water or other natural resources." *Ray, supra* at 309. Importantly, we held in *Ray* that the necessary showing to establish a plaintiff's prima facie case is "not restricted to actual environmental degradation but also encompasses probable damage to the environment as well." *Id.* at 309. General rules of evidence govern this inquiry, and a plaintiff has established a prima facie case when his case is sufficient to withstand a motion by the defendant that the judge direct a verdict in the defendant's favor. *Id.* at 309, citing *Gibbons v Farwell*, 63 Mich 344, 348; 29 NW 855 (1886). The basic import of *Ray* has not changed.

We must now determine what effect plaintiffs' showing that defendants violated the SESCA has on establishing a prima facie case under the MEPA. This first involves an examination of the provisions and purposes of the SESCA. The SESCA defines "earth change" as

> a human-made change in the natural cover or topography of land, including cut and fill activities, which may result in or contribute to soil erosion or sedimentation of the waters of the state. [MCL 324.9101(5); MSA 13A.9101(5).]

This statute also prohibits anyone from maintaining a land use of earth change

> except in accordance with this part and the rules or with the applicable local ordinance and pursuant to a permit approved by the appropriate county or local enforcing agency. [MCL 324.9112(1); MSA 13A.9112(1).]

Pursuant to § 9104, the Department of Natural Resources has promulgated rules for a

> unified soil erosion and sedimentation control program, including provisions for review and approval of site plans, land use plans, or permits relating to erosion control and sedimentation control.

According to these rules, a landowner or developer who engages in an earth change shall obtain a permit from the appropriate enforcing agency before commencement of an earth change that is within five hundred feet of a lake or stream in Michigan. 1979 AC, R 323.1704(1). Moreover, a soil erosion and sedimentation control plan shall be submitted to the appropriate enforcing agency by anyone proposing to undertake an earth change. R 323.1706(1). The soil erosion and sedimentation control plan shall be reviewed and approved before application for a permit by a person so designated and trained by the enforcing agency. R 323.1707(1). Upon a determination that a permit applicant has met all the requirements of these rules and the sediment act, the enforcing agency shall issue a permit for the proposed earth change. R 323.1707(5). The Court of Appeals agreed with the trial court that defendants "technically" violated the SESCA. Slip op, p 2. It is not disputed that defendants violated the SESCA and the rules promulgated pursuant to it.

The Court of Appeals also acknowledged that a major purpose of the SESCA is to protect Michigan waters from pollution, the greatest source of which is sedimentation. Slip op, p 2; Executive Legislative Analysis, HB 4709, January 18, 1972.[4] However, it then held that plaintiffs presented no evidence that defendants' violations actually resulted in any type of water pollution. Thus, held the Court of Appeals, the defendants' SESCA violations did not constitute a violation of the MEPA. Slip op, p 2. Sedimentation and erosion is a well-recognized source of water pollution. In his treatise, Professor Frank P. Grad of the Columbia University School of Law stated:

> Sediments carried by erosion represent the greatest volume of wastes entering surface waters. The volume of suspended solids reaching U.S. waters is at least 700 times greater than the total amount of sewage discharges. Sedi-

---

[4] This analysis describes the purpose of the SESCA:

Soil erosion and sedimentation control was officially recognized by the legislature as early as 1937 when it enacted Act 297 of Public Acts of 1937, known as the Soil Conservation Districts Law. Added emphasis to soil erosion and sedimentation control has come to the forefront in recent years with recognition that from the standpoint of volume, sedimentation is the greatest polluter of water. For thirty years the State Soil Conservation Committee and the Soil Conservation Districts have been assisting landowners to reduce erosion. In recent years it has been recognized that many non-agricultural land uses are contributing large quantities of sediment to water. Highway construction, subdivision and shopping center developments and industrial building are examples of such contributors.

Several local government units have already enacted construction ordinances which contain provisions for soil erosion and surface water movement control. The purpose of this bill is to provide for a statewide soil erosion and sedimentation control program with uniform rules and guidelines which may be used both statewide and by local entities to control soil erosion and sedimentation.

ments are washed in from croplands, unprotected forest soils, overgrazed pastures, strip mines, roads, and bulldozed urban areas. Agricultural development increases land erosion rates four to nine times over the rate from lands with natural cover. Construction may increase the rate a hundredfold. Federal studies have estimated the average sediment yield during a rainstorm at highway construction sites at about 10 times that for cultivated land, 200 times that for grass areas, and 2,000 times that for forest areas—depending on the amount of rainfall, land slope, and the exposure of the bank. High rates of sediment production also occur from commercial and industrial construction in urban areas. [2 Environmental Law, § 3.01(1)(f)(i), p 3-18.]

Professor Grad's explanation of the effect of sedimentation and erosion on water supports that contained in the Executive Legislative Analysis. See n 4. Thus, a major purpose of the SESCA is to prevent and control water pollution caused by sedimentation and erosion. Moreover, sedimentation and erosion necessarily implicate soil. The provisions of the SESCA and the rules promulgated thereto clearly evidence the legislative intent to protect soil. Additional evidence of the legislative intent to protect soil and water is found in part 93—Soil Conservation Districts—of the Soil Conservation, Erosion, and Sedimentation Control portion of article II, chapter 2 of the Natural Resources and Environmental Protection Act, where the Legislature has expressly provided:

It is the policy of the legislature to provide for the conservation of the soil and water resources of this state and for the control and prevention of soil erosion, and thereby to conserve the natural resources of this state, control floods, prevent impairment of dams and reservoirs, assist in maintaining the navigability of rivers and harbors, preserve wildlife, protect the tax base, protect public lands, and pro-

> tect and promote the health, safety, and general welfare of
> the people of this state. [MCL 324.9302; MSA 13A.9302.]

Thus, the Legislature has clearly provided that the protection of the soil and water of this state through the prevention of sedimentation and erosion is of the utmost importance.

Now that we have established that the purpose of the SESCA is to prevent environmental harm caused by sedimentation and erosion, the crux of the issue then becomes whether plaintiffs' showing of defendants' SESCA violations established a prima facie case under the MEPA of actual or likely pollution, impairment, or destruction of a natural resource. The import of our examination of the provisions, purposes, and policies of the SESCA is to analyze whether the trial court properly determined the appropriate standard by which to evaluate the plaintiffs' claim and the defendants' conduct pursuant to § 1701(2). We conclude, on the basis of the purposes of the SESCA and its public policy, that the trial court properly determined the SESCA to be the appropriate pollution control standard applicable in this case.

At the heart of the Court of Appeals error in this case was its failure to consider subsection 1701(2), which provides:

> In granting relief provided by subsection (1), if there is a
> standard for pollution or for an antipollution device or pro-
> cedure, fixed by rule or otherwise, by the state or an instru-
> mentality, agency, or political subdivision of the state, the
> court may:
>
> (a) Determine the validity, applicability, and reasonable-
> ness of the standard.
>
> (b) If a court finds a standard to be deficient, direct the
> adoption of a standard approved and specified by the court.

This is a vital part of our courts' development of the "common law of environmental quality." However, the development of the common law in this area certainly does not preclude the Legislature or the DNR from further entering the arena of environmental law. To the contrary, that is expressly contemplated by subsection 1701(2). Nonetheless, the courts must still determine whether such legislative and administrative enactments are the appropriate "pollution control" standards to be applied to a claim under the MEPA, as the trial court properly determined in this case.

This function of the Michigan courts was discussed by the United States Court of Appeals for the Sixth Circuit in *Her Majesty the Queen v Detroit*, 874 F2d 332 (CA 6, 1989). Noting that the MEPA is supplementary to other administrative and regulatory procedures provided by law, the court correctly stated that the MEPA specifically authorizes a court to determine the validity, reasonableness, and applicability of any standard for pollution or pollution control *"and* to specify a *new* or *different* pollution control standard if the agency's standard falls short of the substantive requirements of MEPA."[5] *Id.* at 337 (emphasis in original).

Furthermore, the MEPA does not impose specific requirements or standards; instead, it provides for de novo review in Michigan courts, allowing those courts to determine any adverse environmental effect and to take appropriate measures. *Id.* at 341. Finally,

---

[5] Thus, if the trial court in this case had determined that the SESCA did not provide sufficient environmental protection, that is, did not prevent likely or actual environmental harm, it could have specified a different pollution control standard that would have satisfied the MEPA.

Michigan courts are not bound by any state administrative finding, or any federal law. Even though the federal government may determine that a plant is not in violation with either state or federal environmental laws, Michigan courts are still empowered to determine whether the standards applied by the federal government are appropriate and if not, determine whether the plant would meet any more stringent standards selected by the Michigan courts. In sum, MEPA creates a state environmental common law that is unaffected by federal law, and creates an independent state action that is unaffected by anything that happens in the federal sphere of government. [*Id.* at 341.]

By the same token, defendants' argument that the SESCA does not provide for a private cause of action is without merit. The absence of a cause of action under the SESCA does not preclude its use as an appropriate "pollution control" standard for a claim under the MEPA.

However, the Court of Appeals simply applied the so-called *Portage* factors, set forth by another panel of the Court of Appeals in *Portage v Kalamazoo Co Rd Comm*, 136 Mich App 276; 355 NW2d 913 (1984). The *Portage* Court held:

In determining whether the impact of a proposed action on wildlife is so significant as to constitute an environmental risk and require judicial intervention, the court should evaluate the environmental situation prior to the proposed action and compare it with the probable condition of the particular environment afterwards. The factors the court should consider include: (1) whether the natural resource involved is rare, unique, endangered, or has historical significance, (2) whether the resource is easily replaceable . . . , (3) whether the proposed action will have any significant consequential effect on other natural resources . . . , and (4) whether the direct or consequential impact on animals or vegetation will affect a critical number, considering the

nature and location of the wildlife affected. [*Portage, supra* at 282.]

This Court also addressed the issue whether the plaintiffs established a prima facie case under the MEPA in *West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741; 275 NW2d 538 (1979). We held that the plaintiffs demonstrated a likelihood that the issuance of ten permits by the Supervisor of Wells for the proposed drilling of exploratory wells would result in an impairment or destruction of natural resources, noting that there was little dispute that the drilling of the wells "will have some adverse impact upon some wildlife, particularly elk, bobcat and bear." *Id.* at 755. After thoroughly examining the plaintiffs' proofs,[6] this Court recognized that

virtually all human activities can be found to adversely impact natural resources in some way or other. The real question before us is when does such impact rise to the level of impairment or destruction? [*Id.* at 760.]

We then held that the limited number of elk, the unique nature and location of the herd, and the apparent serious and lasting damage that would result to the herd constituted an impairment or destruction of a natural resource. *Id.* at 760.

Defendants argue, on the basis of their reading of *Environmental Action Council* and *Portage*, that the trial court made no findings about whether sand or

---

[6] The defendants offered none, resting their case on a denial that the plaintiffs established a prima facie showing that the defendant's conduct had or was likely to impair, pollute, or destroy a natural resource. *Id.* at 755.

vegetative cover were natural resources,[7] that beach sand is arguably one of the most easily replaceable "elements" in Michigan, that plaintiffs presented no evidence that the excavation would affect any other natural resource, and, finally, there was no showing that there was a direct or consequential effect on a "critical number" of animals or vegetation. Defendants also thought it particularly significant that a witness from the DNR testified that no permit would have been issued if there were any MEPA implications.

Regardless of the validity of the *Portage* factors, defendants' argument is inherently flawed for several reasons. First, the *Portage* Court acknowledged that the "removal of trees, a form of wildlife, constitutes destruction of a natural resource under the MEPA." *Id.* at 281. Thus, the holding in *Portage* was not based on a finding that trees were not a natural resource or that the number of trees in Michigan somehow

---

[7] This argument is based on a line of Court of Appeals opinions beginning with *Kimberly Hills Neighborhood Ass'n v Dion*, 114 Mich App 495; 320 NW2d 668 (1982). In this case, the Court held that a "dual inquiry must be conducted: (A) whether a natural resource is involved, and (B) whether the impact of the activity on the environment rises to the level of impairment to justify the trial court's injunction." *Id.* at 503. The Court rejected both definitions of "natural resource" proposed by the parties. The plaintiffs argued that all animals, presently existing plant life, and conditions naturally located on land were natural resources. The defendants argued that the Legislature intended the term natural resources to be limited to those resources that are unique and relatively rare or that are somehow ecologically important. *Id.* at 504. While concluding that the wildlife, plant life, and water involved in that case were indeed natural resources the Court held that the "real question before us is whether the likely impact of defendants' proposed activities rises to the level of impairment or destruction." *Id.* at 505. Placing a restrictive definition of "natural resource" on the courts is not helpful in evaluating a claim under the MEPA. What is *most* significant is determining whether the effect on the environment rises to the level of actual or likely pollution, impairment, or destruction of a natural resource.

negated their status as a natural resource.[8] Likewise,
the Court of Appeals in this case acknowledged that
sand is a natural resource. Slip op, p 2. Second, plain-
tiffs are not required to show that a multitude of nat-
ural resources are affected. Third, simply because a
DNR witness testified that the issuance of the permit
did not have any MEPA implications does not make it
so. We found it error for a trial judge to defer to the
DNR's conclusion that no pollution, impairment, or
destruction of a natural resource was likely to result.
*Environmental Action Council, supra* at 752. The
trial judge has a responsibility to independently deter-
mine the existence of actual or likely pollution,
impairment, or destruction. *Id.*

Furthermore, the *Environmental Action Council*
analysis involved an evaluation of the plaintiff's
proofs to determine the proper standard under which
the court should grant relief. However, the factors
used, like the *Portage* factors, were applicable to the
facts of that case, the natural resources involved, and
the evidence presented. It does not necessarily follow
that because the natural resources involved here may
not be scarce or unique, no actual or likely pollution,
impairment, or destruction exists. The MEPA does not
require air, water, or other natural resources to be
"scarce" or "unique" to be protected from actual or
likely pollution, impairment, or destruction. Indeed,
one of the primary purposes of the MEPA is to protect
our natural resources *before* they become "scarce." In
*Environmental Action Council,* the nature of the

---

[8] Defendants' argument confuses the issues whether a natural resource
is involved and the determination of the effect on natural resources. The
*Portage* factors have been used by the Court of Appeals to determine the
*effect* on the environment, not to *define* "natural resource."

herd—its limited number, unique nature, and location—provided, in part, the basis for finding that the effect rose to the level of impairment or destruction. This case is not and need not be the same; it is the actual or likely effect on the natural resources implicated in this case that is at issue.

Thus, our conclusion is not that the *Portage* factors are necessarily incorrect or invalid, but that each alleged MEPA violation must be evaluated by the trial court using the pollution control standard appropriate to the particular alleged violation. Assuming that the *Portage* factors were proper for assessing whether the activity in that case violated the MEPA, it does not follow that the *Portage* factors, like the factors used in *Environmental Action Council,* are the proper pollution control standard here. A pollution control standard indeed has been articulated by the Legislature, through the SESCA, and by the DNR, through the rules promulgated by it pursuant to the SESCA. It is proper for the trial court to independently determine whether these pollution control standards are valid, applicable, and reasonable in accordance with the courts' development of the common law of environmental quality. If the trial court finds them deficient, it may direct the adoption of another pollution control standard that it so approves and specifies. Here, the trial court found the SESCA and the rules promulgated thereunder to be valid, applicable, and reasonable pollution control standards by which to evaluate plaintiffs' MEPA claim and defendants' conduct. The trial court carefully evaluated plaintiffs' claim and found that plaintiffs met their burden of proving by a preponderance of evidence that defendants' actions would result in actual or likely pollution, impairment,

or destruction of a natural resource in violation of the MEPA.

The Court of Appeals held that a "technical violation" of the SESCA did not equate to a "per se MEPA violation under the circumstances of this case." Contrary to the Court of Appeals holding in this case based on *Dafter*,[9] a prima facie case under the MEPA can be established by proving violations of the SESCA. Where the purpose of the statute used as a pollution control standard is to protect our natural resources or to prevent pollution and environmental degradation, a violation of such a statute can establish a prima facie case under the MEPA. The major purposes of the SESCA are to protect water and soil through the prevention and control of erosion and sedimentation. Thus, a violation of the SESCA can establish a prima facie case under the MEPA, provided that the trial judge has deemed the SESCA standards appropriate, applicable, and reasonable.[10]

Here, the trial court made findings of fact, in compliance with the MEPA and *Ray*, indicating those facts that led it to conclude that defendants had not suc-

---

[9] In *Dafter, supra* at 504, the case on which the Court of Appeals specifically relied, the Court held that the plaintiff's failure to address the *Portage* factors and merely alleging violations of another statute were insufficient to establish a violation of the MEPA.

[10] We emphasize that this is not the end of the inquiry. The trial court held that plaintiffs' showing of defendants' SESCA violations established a prima facie claim under the MEPA. Then, defendants had the opportunity to rebut that prima facie showing either by submitting evidence to the contrary, i.e., that plaintiffs have shown neither pollution, impairment, nor destruction, nor the likelihood thereof, in spite of proof of the SESCA violations, *or* by showing that there is no feasible and prudent alternative to defendants' conduct. Subsection 1703(1). As plaintiffs point out, one could argue that the MEPA is violated any time someone violates the SESCA by putting a shovel in the ground within five hundred feet of a lake or stream. However, the rebuttal and affirmative defense provisions of the MEPA address such frivolous claims.

cessfully rebutted plaintiffs' prima facie case. *Id.* at 310-311. Subsequent panels of the Court of Appeals have used the *Portage* factors alone to decide MEPA cases. Those factors are not mandatory, exclusive, or dispositive. Thus, the Court of Appeals did not give substance to subsection 1701(2) or follow the mandate of *Ray* regarding the proper threshold of harm for a prima facie MEPA case. The *Portage* factors may be appropriate or relevant in some cases; however, their use in every case has stifled the development of the "common law of environmental quality."

IV

The second issue we are called on to decide is whether the MEPA permits a trial judge to apportion attorney fees. The specific provision of the MEPA at issue provides that "[c]osts may be apportioned to the parties if the interests of justice require." Subsection 1703(3). Plaintiffs argue that the MEPA codified the common-law exception to the American rule regarding attorney fees by using the language "interests of justice." Thus, the courts of this state must give substance to the common law of environmental quality, including this codified common-law exception. Defendants argue that attorney fees may not be recovered as costs unless expressly authorized by statute or court rule. See RJA, § 2405.

As we have noted previously, "[f]or better or worse, the common-law tradition in Michigan follows what is sometimes called the 'American rule' regarding attorney fees." *Popma v Auto Club Ins Ass'n*, 446 Mich 460, 474; 521 NW2d 831 (1994). This rule provides that attorney fees are not ordinarily recoverable

unless a statute, court rule, or common-law exception[11] provides the contrary. *Id.* at 473.

Plaintiffs maintain that the Legislature, by use of the language "in the interests of justice," codified the "well-established" private attorney general exception to the American rule as articulated by the United States Supreme Court at the time the MEPA was enacted in 1970. Plaintiffs correctly note that the Supreme Court renounced this doctrine in 1975, but assert that the Legislature enacted the MEPA, specifically § 1703, against the background of this "well-established" common-law exception.

We shall now examine the history of the private attorney general exception in the federal system. The Supreme Court referred to the private attorney general doctrine in *Newman v Piggie Park Enterprises, Inc*, 390 US 400; 88 S Ct 964; 19 L Ed 2d 1263 (1968). Referring to congressional legislative history, the Court noted that if a title II[12] plaintiff obtains an injunction,

> he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered

---

[11] We recognized a common-law exception to this rule, the common-fund exception, which only applies when a prevailing party creates or protects a common fund that benefits himself and others. *Id.* at 475, citing *In re Attorney Fees of Kelman, Loria, Downing, Schneider & Simpson*, 406 Mich 497; 280 NW2d 457 (1979). Courts of equity hold it unfair to allow others to benefit at the expense of the prevailing party without contribution to the costs incurred in securing the common fund. *Popma, supra* at 475. This common-law exception does not apply in this case.

[12] Title II of the Civil Rights Act, 42 USC 2000 *et seq.* Subsection 2000a-3(b) provides that "[i]n any action commenced pursuant to this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person."

of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. *Congress therefore enacted the provision for counsel fees*—not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II. [*Id.* at 402 (emphasis added).]

This mention of the private attorney general doctrine was based on the purpose of and policy underpinning Congress' specific grant of the prevailing party's right to attorney fees as part of costs.

In *Hall v Cole*, 412 US 1, 7, n 7; 93 S Ct 1943; 36 L Ed 2d 702 (1973), on which plaintiffs rely heavily, the Supreme Court had "no occasion to consider that question," whether attorney fees might be justified on the ground that the respondent acted as a "private attorney general," by vindicating a policy that Congress considered of high priority. In addition to the fact that this case was decided three years *after* the MEPA was enacted, it hardly provides a solid basis for finding that a "well-established" common-law exception to the American rule ever existed in the federal system.[13]

---

[13] While plaintiffs' argument only addresses the Supreme Court precedent regarding the private attorney general exception, we note that the general state of the common law in lower federal courts and state courts in 1970 also contradicts plaintiffs' position. While we are not purporting to offer an authoritative analysis of the state of the common law on this issue as it stood in 1970, we find several general principles pervasive. First, the lower federal courts adhered to the rule that, absent a contrary statutory provision, court rule, or contractual provision, the prevailing party is not entitled to attorney fees. See *Stevens v Abbott, Proctor & Paine*, 288 F Supp 836, 848 (ED Va, 1968). However, the federal courts also recognized the same two exceptions acknowledged by the Supreme

Finally, in *Alyeska Pipeline Service Co v Wilderness Society*, 421 US 240, 245; 95 S Ct 1612; 44 L Ed 2d 141 (1975),[14] the Supreme Court acknowledged the existence of two common-law exceptions to the American rule—the bad-faith exception and the common-benefit exception—but reversed the federal court of appeals holding that litigants who vindicate important statutory rights of all citizens were entitled to attorney fees. The Supreme Court rejected this "far-reaching" exception because it was "inappropri-

---

Court in *Alyeska Pipeline Service Co v Wilderness Society*, 421 US 240; 95 S Ct 1612; 44 L Ed 2d 141 (1975): (1) the common-fund exception, see *Stevens, supra* at 848-849; and (2) the bad-faith exception, see *Taussig v Wellington Fund, Inc*, 187 F Supp 179, 222 (D Del, 1960), aff'd 313 F2d 472 (CA 3, 1963); and *Stevens, supra* at 849. Second, where the lower federal courts did mention the "private attorney general" doctrine before 1970, it was often in reference to title VII of the Civil Rights Act, which, like title II of that act, permitted courts to award a prevailing party reasonable attorney fees. See *Clark v American Marine Corp*, 320 F Supp 709, 710 (ED La, 1970), aff'd 437 F2d 959 (CA 5, 1971). After 1970, the lower courts in the federal system began expanding the private attorney general exception. See *Alyeska, supra* at 270, n 46.

The state courts also followed the general rule that attorney fees were not permitted in the absence of a statutory provision to the contrary or an express agreement of the parties. See *Stone v Jeffres*, 208 So 2d 827, 828-829 (Fla, 1968); *Keel v Covey*, 206 Okla 128, 132; 241 P2d 954 (1952); *Vonachen v Independent Lumber*, 172 Kan 545, 547; 241 P2d 775 (1952); *Abramson v Abramson*, 161 Neb 782, 793; 74 NW2d 919 (1956); *Harris v Short*, 253 Iowa 1206, 1208; 115 NW2d 865 (1962); *Colvin v Superior Equipment Co*, 96 Ariz 113, 122; 392 P2d 778 (1964). Some state courts, pre-1970, while acknowledging the general rule, recognized the common-fund exception. See *Ewing v First Nat'l Bank of Atlanta*, 209 Ga 932, 933; 76 SE2d 791 (1953); *Hamilton v Liberty Nat'l Life Ins Co*, 207 So 2d 472, 477 (Fla App, 1968). Other state courts simply recognized the general power of a court of equity to award attorney fees under some circumstances. See *Gilbert v Hoisting & Portable Engineers*, 237 Or 130, 141; 390 P2d 320 (1964); *Low v Low*, 255 Ala 536, 540; 52 So 2d 218 (1951), overruled on other grounds *Starr v Starr*, 293 Ala 204; 301 So 2d 78 (1974).

[14] Plaintiffs characterized this case as putting an end to a "well-established" common-law exception to the general rule; however, it does not appear from any Supreme Court precedent that this exception was ever "well established."

ate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation in the manner and to the extent urged . . . ." *Id.* at 247. The Supreme Court noted that Congress had not repudiated the common-law exception to the general rule, but neither had it modified the limitations on taxable fees mandated by statute nor extended any authority to the judiciary to allow attorney fees as costs whenever the courts deem it appropriate. *Id.* at 260. This is also true regarding our Legislature's enactment of RJA, § 2405.[15]

In sum, the Supreme Court persuasively held:

> It is true that under some, if not most, of the statutes providing for the allowance of reasonable fees, Congress has opted to rely heavily on private enforcement to implement public policy and to allow counsel fees so as to encourage private litigation. . . . But congressional utilization of the private attorney general concept can in no sense be construed as a grant of authority to the Judiciary to jettison the traditional rule against nonstatutory allowance to the prevailing party and to award attorneys' fees whenever the courts deem the public policy furthered by a particular statute important enough to warrant the award. Congress itself presumably has the power and judgment to pick and choose among its statutes and to allow attorneys' fees under some, but not others. But it would be difficult, indeed, for the courts, without legislative guidance, to consider some statutes important and others unimportant and

---

[15] This section provides, in pertinent part,

The following items may be taxed and awarded as costs unless otherwise directed:

\*    \*    \*

(6) Any attorney fees authorized by statute or by court rule.

to allow attorneys' fees only in connection with the former. [*Alyeska, supra* at 263-264.]

The Supreme Court's analysis in *Alyeska Pipeline* comports with our holding in *Popma* and with the observation that the Legislature knows how to provide for attorney fees when enacting a statute and has done so on many occasions, including several environmental protection statutes.[16] Plaintiffs are correct that the MEPA's mandate that Michigan courts develop the common law of environmental quality does give the courts tremendous discretion in developing the *substantive law* of the MEPA. It does not so provide with regard to the apportionment of costs.

Contrary to plaintiffs' assertions, our holding does not conflict with *Macomb Co Taxpayers Ass'n v L'Anse Creuse Public Schools*, 455 Mich 1, 9; 564 NW2d 457 (1997), in which we held that the voters who ratified the Headlee Amendment understood "costs" to mean "all expenses," rather than the limited, technical use of "costs" as a legal term of art. We rejected the defendant's argument that the voters should be charged "with knowledge of technical details of our legal system, such as the so-called American rule . . . for awarding costs." *Id.* at 8.

However, the Legislature is the entity that defined "costs" in § 2405. Thus, to charge the Legislature, the body that defined costs in § 2405 and enacted the

---

[16] For example: water resources protection act, MCL 324.3101 *et seq.*; MSA 13A.3101 *et seq.*; hazardous waste management act, MCL 324.11101 *et seq.*; MSA 13A.11101 *et seq.*; liquid industrial wastes act, MCL 324.12101 *et seq.*; MSA 13A.12101 *et seq.*; environmental remediation act, MCL 324.20101 *et seq.*; MSA 13A.20101 *et seq.*; surface and underground coal mine reclamation act, MCL 324.63501 *et seq.*; MSA 13A.63501 *et seq.*

MEPA using the term "costs," with knowledge of the American rule and with the technical meaning of the word "costs" is the only logical result. Moreover, it is a well-established principle that the Legislature is presumed to be aware of all existing statutes when enacting new law. *Walen v Dep't of Corrections*, 443 Mich 240, 248; 505 NW2d 519 (1993).

Perhaps it is true that the inability of a trial judge to award attorney fees to the MEPA plaintiffs may impede the enforcement of the MEPA. However, the proper forum for this public policy debate is the Legislature. The language of the statute is clear and unambiguous. We cannot create ambiguity where there is none by looking to the legislative history or by *assuming* the Legislature codified a not-so-"well-established" common-law doctrine. Thus, we cannot and should not unduly expand the meaning of the term "costs." The Legislature has spoken, in accordance with RJA, § 2405, regarding which costs are apportioned in the interests of justice in an action under the MEPA, and it has *not* included attorney fees.

It may be that the inability of a trial judge to apportion attorney fees in the interest of justice is critical to effective judicial administration of the MEPA. If attorney fees were apportionable in the interests of justice, plaintiffs would be compensated for pursuing environmental protection actions that protect our natural resources and our environment for the benefit of all Michigan citizens, and defendants would be protected from frivolous lawsuits. However, this is a matter for the Legislature to address.

V

In conclusion, we hold that plaintiffs' showing that defendants violated the SESCA can establish a prima facie case under the MEPA, and, therefore, we reverse the Court of Appeals decision in part and reinstate the judgment of the trial court in part. We also affirm the decision of the Court of Appeals in part, agreeing with its conclusion that attorney fees are not included in the "costs" that may be apportioned pursuant to the MEPA.

MALLETT, C.J., and BOYLE and TAYLOR, JJ., concurred with BRICKLEY, J.

WEAVER, J., concurred only in the result.

CAVANAGH, J. (*concurring in part and dissenting in part*). I concur fully in the majority's analysis and conclusion regarding the presence of a Michigan environmental protection act (MEPA) violation in this case, and the analysis regarding the role of a soil erosion and sedimentation control act (SESCA) violation in such a determination, as contained in parts II and III of the majority's opinion. I fear, however, that the majority, while on one hand recognizing the broad scope and important implications of the Legislature's determination in enacting the MEPA, nonetheless, in its conclusion regarding the availability of attorney fees, reaches a decision that in effect will serve to constrain the application of the MEPA only to rare occasions and, thus, frustrate the very purpose of the statute. Accordingly, I respectfully dissent with respect to the analysis contained in part IV of the majority's opinion, and its conclusion regarding the unavailability of attorney fees in MEPA actions.

As we have long noted, when it was enacted, the MEPA represented a bold step forward by our Legislature.[1] Recognizing the importance of our natural resources and the dangers in entrusting their care solely to state action, the Legislature granted standing to any individual to bring an action alleging undue harm to our natural resources. The wisdom and effectiveness of this procedure was recognized by many of our sister states, who, along with the federal government, came to enact similar environmental laws patterned on Michigan's model.[2]

Throughout its history, the application of the MEPA has generally involved the availability of attorney fees.[3] Recently, however, two appellate cases have held against attorney fees, although the procedural posturing of one makes it of dubious value.[4] It seems

---

[1] See, e.g., *Ray v Mason Co Drain Comm'r*, 393 Mich 294; 224 NW2d 883 (1975).

"The Michigan Environmental Protection Act was the first statute to provide for citizen suits to protect the environment from degradation by either public or private entities and to provide a broad scope for court adjudication. The Federal Clean Air Act and Water Pollution Control Amendments, as well as several state statutes, have followed the Michigan Act's lead." [*Id.* at 298, n 1, quoting Sax & DiMento, *Environmental citizen suits: Three years' experience under the Michigan environmental protection act*, 4 Ecology L Q 1 (1974).]

[2] *Id.*

[3] See, e.g., *Dafter Twp v Reid*, 131 Mich App 283; 345 NW2d 689 (1983), *Three Lakes Ass'n v Kessler*, 101 Mich App 170; 300 NW2d 485 (1980), *Superior Public Rights, Inc v Dep't of Natural Resources*, 80 Mich App 72; 263 NW2d 290 (1977), and *Taxpayers & Citizens in the Public Interest v State Hwys Dep't*, 70 Mich App 385; 245 NW2d 761 (1976).

[4] *Platte Lake Improvement Ass'n v Dep't of Natural Resources*, 218 Mich App 424; 554 NW2d 342 (1996), and *Attorney General v Piller (After Remand)*, 204 Mich App 228; 514 NW2d 210 (1994). *Piller*'s value in this debate is limited by the positioning of the parties, where the defendant had been awarded partial attorney fees, in part on the basis of the plaintiff's acquiescence to the defendant's actions by failing to take required

the better view is that, at least until recently, attorney fees have been such an accepted part of MEPA litigation that their availability generally has not even been at issue. This, by and large, has been the case for over fifteen years. It is against this backdrop that we begin the analysis of this case and this context, to which, it seems, the majority fails to give sufficient weight.

While I do not disagree in principle with much of the majority's analysis of this issue, I find fault with its application to the present case. In the MEPA, the Legislature utilized language allowing for costs to "be apportioned to the parties if the interests of justice require." MCL 324.1703(3); MSA 13A.1703(3). The majority correctly notes that the Legislature, since the enactment of the MEPA, has enacted a host of remedial environmental statutes that allow for the apportionment of attorney fees.[5] What the majority fails to appreciate is the obvious inference that, if the progeny of the MEPA are to provide for attorney fees, it follows that the statute that began this entire area of law for our state would also allow them. While the Legislature is presumed to be aware of existing statutes and judicial decisions when enacting new law, I would not extend this presumption to find that the Legislature did not intend to give operative effect to its enactment of the MEPA, particularly where both the context of the MEPA and the Legislature's later pronouncements point in the opposite direction.

The entire Court agrees that the Legislature enacted the MEPA to "protect our natural resources

---

action on a permit application under another statute, which required such failure to be considered approval of the application.

[5] See, *ante* at 41, n 15.

*before* they become 'scarce.' "[6] In doing so, the Legislature chose to give standing to individual citizens to pursue actions to halt environmental harm, rather than rely solely on the various state agencies that are charged with protecting our environment. The Legislature seems to have implicitly recognized that there would be times when such agencies could not, or would not, act and that the overriding concern for preserving the quality of our environment mandated the availability of private action in such cases.[7] That said, I cannot conclude that the Legislature intended to limit this availability to that minuscule portion of the population capable of pursuing environmental actions at their personal expense.

The reality of the MEPA actions, as evidenced by the voluminous record in this case, is that they are often protracted and technical proceedings, the cost of which would be prohibitive to most persons, even when, as the plaintiffs herein, they were personally harmed by the actions that also endangered the environment. To expect that the MEPA will be utilized by individuals to protect the environment at private expense is to ignore the reality of litigation today.

---

[6] *Ante* at 34.

[7] As Professor Sax, a leading authority on, and drafter of, the MEPA, has noted:

> Previously these agencies had been given a sweeping mandate to enforce environmental standards as they thought best, and their decisions were subject to judicial review only for arbitrary and abusive use of their authority or for violation of explicit statutory language. Now these agencies must be prepared to defend themselves against charges that their decisions fail to protect natural resources from pollution, impairment, or destruction. [Sax & Conner, *Michigan's environmental protection act of 1970: A progress report*, 70 Mich L R 1004, 1005 (1972).]

And yet it is in those situations, where the environment is harmed to the detriment of no one in particular, but all of us in reality, that the Legislature intended the MEPA to operate. Under the majority's decision today, I fear that operation by and large will be thwarted. Accordingly, I dissent from the majority's conclusion that attorney fees are not apportionable in MEPA actions as the interests of justice require.

KELLY, J., concurred with CAVANAGH, J.