*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHIGAN ELECTRICAL TRANSMISSION
COMPANY, LLC,

UNPUBLISHED
December 30, 2024
10:37 AM

        Plaintiff/Counterdefendant-Appellee,

v

No. 367092
Midland Circuit Court
LC No. 21-008202-CC

WILDLIFE RECOVERY ASSOCIATION,

        Defendant/Counterplaintiff-Appellant,

and

JAMES GAMERO, YANHIA GAMERO, DTE GAS
COMPANY, UNKNOWN HEIRS, LEGATEES, ET
AL. OF BRONSON HARRIS, UNKNOWN HEIRS,
LEGATEES, ET AL. OF THERESA HARRIS,
BLOCH BROTHERS CORP, UNKNOWN HEIRS,
LEGATEES, ET AL. OF MARY WINOGENE
FOSTER, MIDLAND COUNTY BOARD OF
ROAD COMMISSIONERS, and UNKNOWN
TENANTS OF VACANT LAND,

        Defendants.

Before: BORRELLO, P.J., and MALDONADO and WALLACE, JJ.

PER CURIAM.

Defendant-counterplaintiff, Wildlife Recovery Association (WRA), appeals by right the trial court's order granting summary disposition in favor of plaintiff-counterdefendant, Michigan Electrical Transmission Company, LLC (METC) pursuant to MCR 2.116(C)(10) (no genuine issue of material fact). We affirm.

-1-

## I. BACKGROUND

METC engaged in a project to construct a high-voltage transmission line connecting a new wind-generation power substation to the existing electrical grid. Most of the line route runs down the road bisecting the Little Swamp Sanctuary and, in relevant part, across the front of the WRA property. Therefore, METC sought to acquire an easement across the front of the WRA property for the transmission line. Approximately 1.55 to 1.815 acres of the WRA property would be affected, although no poles would be erected on the WRA property itself. However, some vegetation clearing would occur, and transmission lines would overhang the WRA property.

METC initially sought to condemn an easement pursuant to its statutory power of eminent domain. The parties eventually settled the condemnation claim, and it is not at issue in this appeal. WRA filed a counterclaim pursuant to the Michigan Environmental Protection Act (MEPA), MCL 324.1701 *et seq*. WRA asserted that both the construction of the transmission line and the transmission line itself would kill many animals and damage the value of the property as a wildlife sanctuary. WRA presented testimony from its principals and two experts who expressed concerns that the transmission line could harm wildlife. In particular, WRA identified certain bird species that were "species of special concern"[1] that would be killed by flying into the high-voltage lines. WRA also identified a species of turtle that was also of special concern—the Blanding's Turtle— that would suffer deaths due to the disruptions to the wetlands. METC provided testimony from experts and individuals involved in planning the transmission line suggesting that birds rarely struck transmission lines, that METC would use environmental best practices to minimize animal deaths and disruptions to the ecology, that only a small portion of the WRA property would be affected by converting forested wetland into scrub-shrub wetland, and that its experience with transmission lines through wetlands showed that transmission lines' actual effect on the local ecology was minimal.

The trial court concluded that WRA failed to establish a prima facie violation of the MEPA, so it granted summary disposition in favor of METC. This appeal followed.

## II. STANDARDS OF REVIEW AND GOVERNING LAW

"In general, we review de novo the proper application of MEPA." *Preserve the Dunes, Inc v Dep't of Environmental Quality (On Remand)*, 264 Mich App 257, 259; 690 NW2d 487 (2004). However, "we will not overturn a trial court's findings of fact unless they are clearly erroneous." *Id.* "A finding is clearly erroneous when evidence exists to support it but our Court is left with a definite and firm conviction that the trial court made a mistake." *Trout Unlimited, Muskegon-White River Chapter v White Cloud*, 209 Mich App 452, 456; 532 NW2d 192 (1995).

Pursuant to MCR 324.1701, "any person may maintain an action in the circuit court . . . for declaratory and equitable relief against any person for the protection of the air, water, and other

---

[1] A species of special concern is not yet threatened or endangered, but is on the path to becoming threatened or endangered if not actively protected.

natural resources and the public trust in these resources from pollution, impairment, or destruction." When "determining whether a prima facie case under the MEPA has been established, a court must not weigh the environmental risk with the good to be accomplished by the action." *Attorney General ex rel Natural Resources Comm v Balkema*, 191 Mich App 201, 206; 477 NW2d 100 (1991). Instead, "the trial court must consider whether a natural resource was involved and whether the effect of the activity on the environment rose to the level of impairment to justify the court's injunction." *Dafter Sanitary Landfill v Mich Dep't of Natural Resources*, 198 Mich App 499, 504; 499 NW2d 383 (1993) (quotation marks and citation omitted). "When the plaintiff in the action has made a prima facie showing . . . , the defendant may rebut the prima facie showing by the submission of evidence to the contrary." MCL 324.1703(1).

This Court has developed a set of factors, now known as the *Portage* factors, to assist with determining whether judicial intervention is warranted.

> [When] determining whether the effect rises to the level of impairment that justifies an injunction by the court, the following factors should be considered: (1) whether the natural resource involved is rare, unique, endangered, or has historical significance, (2) whether the resource is easily replaceable (for example, by replanting trees or restocking fish), (3) whether the proposed action will have any significant consequential effect on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed), and (4) whether the direct or consequential impact on animal or vegetation will affect a critical number, considering the nature and location of the wildlife affected. [*Dafter Sanitary Landfill*, 198 Mich App at 504, quoting *Portage v Kalamazoo Co Rd Comm*, 136 Mich App 276, 282; 355 NW2d 913 (1984).]

The *Portage* factors, while relevant, "are not mandatory, exclusive, or dispositive." *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 37; 576 NW2d 641 (1998). In addition to attempting to rebut a plaintiff's prima facie case, a defendant, as an affirmative defense, may attempt to show "that there is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction." MCL 324.1703(1).

III. ANALYSIS

WRA argues that the trial court erred by finding that METC's plans do not impact the environment to the extent necessary to warrant judicial intervention pursuant to the MEPA. We disagree.

As a threshold matter, WRA argues that the trial court erred with respect to its reliance on the *Portage* factors. WRA specifically argues that the trial court's analysis relied entirely on the *Portage* factors; however, this argument does not align with the court's actual reasoning. The trial court explicitly acknowledged that the *Portage* factors were neither mandatory nor conclusive. Although the court used *Portage* as the framework for its analysis, it did not imply adherence to a rigid application of these factors. WRA's critique of the *Portage* factors suggests that this Court exceeded its authority by establishing guidelines not present in the statute. Nonetheless, while

*Portage* was decided before November 1, 1990, it has been reaffirmed by several published opinions issued after that date, such as *Dafter Sanitary Landfill*, 198 Mich App at 504. Therefore, despite WRA's objections, the *Portage* factors constitute stare decisis, and it was appropriate for the trial court to consider them.

Regarding the first *Portage* factor, the trial court did not err by finding that the land did not contain wildlife that is rare, unique, endangered, or historically significant. There was no evidence of any wildlife that was threatened or endangered. There were suggestions that there could be animals that are of "special concern," meaning that they are on track to become threatened in the absence of conservation efforts. The trial court was perhaps a little too dismissive of this classification given that "one of the primary purposes of the MEPA is to protect our natural resources *before* they become 'scarce.'" *Nemeth*, 457 Mich at 34. However, concluding that the possibility of future threatened status does not make a species rare or unique was not unreasonable. Nevertheless, the court considered the evidence pertaining to these species, and WRA failed to establish that METC's activities threatened these species.

There has been much debate regarding whether there was record evidence that the Blanding's turtle, a species of special concern, lived or was seen within the WRA. No one claimed personal knowledge of Blanding's turtles residing on the property; instead, testimony indicated that there might be, given the ecosystem's particular hospitality to their needs. Finally, while WRA's expert testified that Blanding's turtles were a species of special concern, he also stated that their population remained stable. WRA also argued that the transmission lines would harm avian species. The trial court did not err by finding that WRA did not present sufficient evidence that there were rare, unique, or endangered birds on the property. Again, there was no evidence regarding endangered birds, only a couple of species of birds that were of special concern. Further, the evidence regarding the existence of these birds was highly speculative. WRA's list of birds on the property was drawn largely from the Michigan Breeding Bird Atlas. Barbara Rogers testified to having observed some of the birds on the property, but there was no documentation of their continued presence.

The trial court likewise did not clearly err by finding that the resources at issue are easily replaceable. The area where the lines are to run will have shrub-scrub wetlands added following the construction, and there was expert testimony that Blanding's turtles would do well in this type of wetland. While it is undisputed that some animal deaths would result from this project, there was no evidence that these species would be unable to repopulate after the project's completion or that the project would have any noteworthy impact on their populations. Moreover, METC prepared mitigation plans when applying for the relevant permits, and these plans included the creation of wetlands that will more than offset those lost via construction of the transmission lines. Nothing in the record suggests that the vegetation lost cannot be replanted.

Regarding the third *Portage* factor, while WRA complains that this factor is inconsistent with the statute, it is undisputed that there is no evidence suggesting that other natural resources will be impacted. Finally, the court did not clearly err by finding that WRA did not establish that the impact of the transmission lines would affect a critical number of animals or vegetation. WRA presented a photograph of a dead Blanding's turtle, but it appears as though this turtle was killed by a motor vehicle. There is no evidence that the death of this turtle was connected to this project. There is no dispute that the transmission lines will cause the death of some birds, but our Supreme

Court has recognized that adverse impacts on natural resources are all but inevitable; accordingly, the question is not whether harm will occur, but "when does such impact rise to the level of impairment or destruction?" *West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 275 NW2d 538 (1979). In this case, WRA's evidence does not attempt to answer that question. WRA's expert in birds testified that birds do strike power lines, but she conceded that there was a wide range of estimates regarding how many birds were actually killed by power lines. Further, while the record was unclear regarding their effectiveness, METC intends to use bird diverters on the power lines. Simply put, WRA failed to meet its burden to put forth evidence regarding the harm that the transmission lines would cause to birds.

In sum, the trial court did not err by finding that WRA failed to establish a violation of the MEPA arising from METC's plans to build transmission lines over WRA's wetlands.

Affirmed. METC, being the prevailing party, may tax costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Allie Greenleaf Maldonado
/s/ Randy J. Wallace