**TOWN OF ST. JOHN,**
et al., Petitioners,

v.

**STATE BOARD OF TAX
COMMISSIONERS,**
Respondent.

No. 49T10–9309–TA–70.

Tax Court of Indiana.

June 16, 2000.

See also, 729 N.E.2d 242.

Thomas M. Atherton, Katz & Korin, P.C., Richard A. Waples, Peter H. Donahoe, Hill Fulwider McDowell Funk & Matthews, P.C., James K. Gilday, Wood Tuohy Gleason Mercer & Herrin, Kenneth J. Falk, Legal Director, Indiana Civil Liberties Union, Indianapolis, IN, for Petitioners.

Karen M. Freeman–Wilson, Attorney General of Indiana, By Jon Laramore, Deputy Attorney General, Indianapolis, IN, for Respondent.

## ORDER AND JUDGMENT ENTRY

FISHER, J.

Petitioners present one issue for consideration: whether the Court should adopt and apply the private attorney general exception to the American rule regarding litigation expenses and order the State Board of Tax Commissioners (State Board) to pay Petitioners' attorneys' fees and costs in this matter.[1]

### FACTS AND PROCEDURAL HISTORY

Proceedings in this matter now approach the seven-year mark. For an overview of this case's procedural history, see *State Board of Tax Commissioners v. Town of St. John*, 702 N.E.2d 1034, 1035–36 (Ind.1998). In an order dated April 23, 1999, the Court asked the parties to submit briefs on the issue of payment of attorneys' fees and costs. Both parties, represented by counsel, responded accordingly. Having received their submissions, the Court heard oral argument on the attorneys' fees issue on February 28, 2000 and took the matter under advisement.[2]

Additional facts will be supplied as needed.

### ANALYSIS, OPINION & ORDER

The issue presented by Petitioners is one of first impression in this Court. The Court first will review the United States Supreme Court's view of the private attorney general exception. Second, the Court will consider Indiana decisions recognizing the exception. Third, the Court will examine the opinions of jurisdictions that have adopted and applied the exception. Fourth, the Court will discuss the decisions of jurisdictions declining to adopt the exception. Finally, the Court will explain why the exception should be recognized and applied in the present case to award Petitioners reasonable attorneys' fees and costs.

### I. United States Supreme Court

The United States Supreme Court, in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 269–71, 95 S.Ct. 1612, 1627–28, 44 L.Ed.2d 141 (1975), ruled that federal courts could not award attorneys' fees using the private attorney general exception. *Alyeska Pipeline* involved a dispute over the anticipated issuance of rights-of-way and special land-use permits by the Secretary of the Interior for a proposed pipeline that would transport oil from the North Slope of Alaska. Following an Act of Congress, the merits of the litigation before the Court of Appeals for the District of Columbia were effectively terminated. However, the Court of Appeals considered and granted the request by respondent environmental groups for attorneys' fees, applying the private attorney general exception to the American rule. *See id.*, 421 U.S. at 245–46, 95 S.Ct. at 1616.

The Supreme Court explained that, under the American rule, the "prevailing liti-

---

1. The American rule is the "requirement that each litigant must pay its own attorney's fees, even if the party prevails in the lawsuit." BLACK'S LAW DICTIONARY 82 (7th ed.1999). *See also Hall v. Cole*, 412 U.S. 1, 4, 93 S.Ct. 1943, 1945–46, 36 L.Ed.2d 702 (1973) (noting that "traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization"). For an overview of the American rule, its development, rationales and its exceptions, see DAN B. DOBBS, DOBBS LAW OF REMEDIES, §§ 3.10(1)-(2) (West Publ'g 2d ed.1993). *See also* John F. Vargo, *The American Rule on Attorney Fee Allocation: The Injured Person's Access to Justice*, 42 AM. U.L.REV. 1567, 1570–

78 (tracing development of American rule). The private attorney general exception allows an award of attorneys' fees to plaintiffs in "certain kinds of important litigation that will result in public benefits, ... at least where such fees are necessary to finance important and beneficial litigation that otherwise might not be brought." DOBBS, *supra* at 398.

2. In this Court's most recent order, dated May 31, 2000, the Court pursuant to IND. TRIAL RULE 54(B) expressly retained jurisdiction over the attorneys' fees issue. *See Town of St. John v. State Bd. of Tax Comm'rs*, 729 N.E.2d 242, 250 n.18 (Ind. Tax Ct. 2000).

gant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Id.*, 421 U.S. at 247, 95 S.Ct. at 1616. The Court noted that in English courts, pursuant to statutory authorization, counsel fees are regularly allowed to the prevailing party. *See id.*, 421 U.S. at 247, 95 S.Ct. at 1616. The Court then proceeded to review the development of limitations imposed by it and Congress as regards attorneys' fees awards. *See id.*, 421 U.S. at 247–59, 95 S.Ct. at 1617–22. In particular, the Court focused upon an 1853 costs statute, as enacted and in its subsequent amended and recodified forms, which specified in detail the nature and amount of taxable items of cost in federal courts. *See id.* at 1618–23. The Supreme Court observed that Congress has made specific provisions for attorneys' fees under certain federal statutes but has not "changed the general statutory rule that allowances for counsel fees are limited to the sums specified by the costs statute." *Id.*, 421 U.S. at 255, 95 S.Ct. at 1620. Furthermore, the Supreme Court pointed out that in recent cases it had "reaffirmed the general rule that, absent statute or enforceable contract, litigants pay their own attorneys' fees." *Id.*, 421 U.S. at 257, 95 S.Ct. at 1621 (citations omitted). However, the Court did acknowledge certain exceptions, which are permissible as "assertions of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress." [3] *Id.*, 421 U.S. at 259, 95 S.Ct. at 1622. The Supreme Court summarized as follows:

> Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorneys' fees; but neither has it retracted, repealed, or modified the limitations on taxable fees contained in the 1853 statute and its successors. Nor has it extended any roving authority to

the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted. What Congress has done, however, while fully recognizing and accepting the general rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights.... Under this scheme of things, it is apparent that the circumstances under which attorneys are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine.

*Id.*, 421 U.S. at 260–62, 95 S.Ct. at 1623–24. *See also id.* nn. 33–35 (listing various federal statutes allowing award of attorneys' fees).

In reversing the Court of Appeals' award of fees, the Supreme Court also focused on whether the federal courts provide a proper arena for determining what polices are more important than others. *See id.*, 421 U.S. at 263–64, 95 S.Ct. at 1625. The Supreme Court opined that "it would be difficult, indeed, for the courts, without legislative guidance, to consider some statutes important and others unimportant and allow attorneys' fees only in connection with the former." *Id.* Moreover, the Supreme Court elaborated that a wide range of statutes arguably satisfies the criterion of public importance. *See id.*, 421 U.S. at 264, 95 S.Ct. at 1625. If that is so, the Court questioned, "how could a court deny attorneys' fees to private litigants in actions under 42 U.S.C. § 1983 seeking to vindicate *constitutional* rights?" *Id.* (emphasis in original). The Supreme Court finally concluded that:

> [Federal courts] are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation or to

---

**3.** These exceptions include: (1) recovery from a common fund; (2) assessment of fees as part of a fine levied by a court for "willful disobedience" of its order; and (3) when the losing party acts in bad faith. *See Alyeska*

*Pipeline,* 421 U.S. at 257–59, 95 S.Ct. at 1621–22. *See also infra,* nn. 4 & 5 (discussing common fund, common or substantial benefit and obdurate behavior doctrines recognized in Indiana).

pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases. *Id.*, 421 U.S. at 269, 95 S.Ct. at 1627.

In discussing the private attorney general exception, state courts often refer to and rely upon the Supreme Court's *Alyeska Pipeline* opinion. Therefore, it is important to keep in mind the basis for the Supreme Court's ruling. In short, the Supreme Court's rejection of the private attorney general exception can be explained as follows: (1) Congress has reserved the right to allow attorneys' fees only under certain circumstances; (2) specific exceptions to the American rule are expressly identified in statute; and (3) without legislative guidance, federal courts may not selectively create new exceptions to the American rule based upon the alleged importance of the public policies at issue. *See id.*

## II. *Indiana Cases*

Indiana courts generally apply the American rule when deciding whether to award attorneys' fees. The Indiana Supreme Court has observed that the "right to recover attorney's fees from one's opponent does not exist in the absence of a statute or some agreement, though a court of equity may, under some circumstances, allow attorneys' fees to be paid out of a fund brought under its control." *See Gavin v. Miller*, 222 Ind. 459, 54 N.E.2d 277, 280 (1944) (citing *State ex rel. Reilly v. United States Fidelity & Guar. Co.*, 218 Ind. 89, 31 N.E.2d 58, 60 (1941)). *See also Trotcky v. Van Sickle*, 227 Ind. 441, 85 N.E.2d 638, 640 (1949) (stating that American rule applies equally in courts of law

and courts of equity) (citations omitted); *Kikkert v. Krumm*, 474 N.E.2d 503, 504–05 (Ind.1985) (noting American rule). The Indiana Court of Appeals on numerous occasions has acknowledged Indiana's adherence to the American rule. *See, e.g., Courter v. Fugitt*, 714 N.E.2d 1129, 1132 (Ind.Ct.App.1999); *Barrington Mgmt. Co. v. Paul E. Draper Family Ltd. Partnership*, 695 N.E.2d 135, 142 (Ind.Ct.App. 1998) (citation omitted); and *Shumate v. Lycan*, 675 N.E.2d 749, 754 (Ind.Ct.App. 1997), *trans. denied.*

■ This Court must decide whether to recognize one particular exception to the American rule—the private attorney general exception. The private attorney general exception has been recognized by the Indiana Court of Appeals, which first noted the exception in *Saint Joseph's College v. Morrison, Inc.* 158 Ind.App. 272, 302 N.E.2d 865, 870 (1973). In *Saint Joseph's College*, the Court of Appeals first concluded that a sub-contractor did not have a valid mechanic's lien for certain work performed under an oral contract, so that the sub-contractor could not recover attorneys' fees pursuant to the Mechanics' Lien Statute. *See id.* at 869 (citing IND.CODE ANN. § 32–8–3–14 (Burns Repl.1965)). The Court then stated that certain limited exceptions to the American rule exists and quoted the following summarization of exceptions from *La Raza Unida v. Volpe*, 57 F.R.D. 94 (N.D.Cal.1972) (citing *Sims v. Amos*, 340 F.Supp. 691 (M.D.Ala.1972), *summarily aff'd*, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972)):

> 1) The "obdurate behavior" situation. Here the courts use their equitable powers to impose costs on defendants who behaved in bad faith.[4]

---

4. The Indiana Supreme Court considered the obdurate behavior exception in *Kikkert v. Krumm*, 474 N.E.2d 503 (Ind.1985). According to the Court, "The nature of an attorney fee award under the obdurate behavior exception is punitive, designed to reimburse a *prevailing party* who has been dragged into *baseless litigation* and thereby subjected to *great*

expense." *Id.* at 505 (citations omitted) (emphasis in original). *Cf. Hall*, 412 U.S. at 5, 93 S.Ct. at 1946 (stating that it is "unquestioned" that federal courts may award attorneys' fees to a successful party where an opponent has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons") (citations omitted).

2) The "common fund" situation. Here the courts use their equitable powers to ensure that the beneficiaries of litigation are the ones who share the expense. This is a defensive use of the equitable power of the courts to prevent the unjust enrichment of "free riders".[5]

3) The "private attorney general" situation. Here the courts use their power offensively when necessary and appropriate to insure the effectuation of a strong Congressional policy.

*Id.* at 870. The Court of Appeals found that neither the "common fund" exception nor the "private attorney general" exception applied to the facts at hand. *See id.*

Moreover, the Court of Appeals determined that the college had not acted in bad faith or with vexatious and oppressive conduct. *See id.* at 870–71. Absent a valid mechanic's lien or "special circumstances," the Court of Appeals held that the trial court had improperly awarded attorneys' fees. *See id.* at 871.

The *Saint Joseph's College* court merely identified the private attorney general exception in dicta; it did not adopt or apply the exception. Several appellate court cases subsequent to the opinion in *Saint Joseph's College* also have identified the exception.[6] Two recent cases merit further discussion.

---

5. "The common fund doctrine is deeply rooted in American jurisprudence[.] . . . Pursuant to the common fund doctrine, the court may award attorney's fees to a party who initiated the action from a fund created or preserved by that party's counsel." *Community Care Ctrs., Inc. v. Indiana Family and Soc. Servs. Admin.*, 716 N.E.2d 519, 542 (Ind.Ct.App. 1999) (citing *Trustees v. Greenough*, 105 U.S. 527, 15 Otto 527, 26 L.Ed. 1157 (1882); CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2675 (1998)), *trans. denied.* The common fund exception is similar to but distinct from the "common benefit" or "substantial benefit" exception. "The substantial benefit rule permits the plaintiff's lawyer to recover from persons who share in a supposed benefit which is not a cash benefit and does not provide funds from which the lawyer can be paid." DOBBS, *supra* note 1 at 396. *See also Hall*, 412 U.S. at 5–7, 93 S.Ct. at 1946–47 (recognizing substantial benefit theory) (citing *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 393–96, 90 S.Ct. 616, 626–27, 24 L.Ed.2d 593 (1970)); *Community Care Ctrs.*, 716 N.E.2d at 542–45 (discussing differences between the two exceptions and holding that common benefit exception should not be applied where award can be based upon tangible benefits or a "fund"). The common benefit or substantial benefit exception is viewed as an extension or outgrowth of the common fund exception. *See Community Care Ctrs.*, 716 N.E.2d at 543. *Accord Serrano v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303, 1309 (1977). Inexplicably, the Supreme Court of Arizona, in adopting the private attorney general exception, as discussed *infra*, equivocated the exception with the substantial benefit exception. *See Arnold v. Arizona Dep't of Health Servs.*, 160 Ariz. 593, 775 P.2d 521, 536–37 (1989) (reciting that trial court had awarded attorneys' fees "under the

'private attorney general doctrine,' also known as the 'substantial benefits doctrine.' ").

6. *See Community Care Ctrs., Inc. v. Indiana Family and Soc. Servs. Admin.*, 716 N.E.2d 519, 544 (Ind.Ct.App.1999) ("Courts of this State have also consistently recognized, albeit rarely, a private-attorney-general exception to the American Rule to justify an award of attorney's fees.") (citations omitted), *trans. denied; Citizens Action Coalition of Ind., Inc. v. PSI Energy, Inc.*, 664 N.E.2d 401, 405 n. 2 (Ind.Ct.App.1996) ("In the 'private attorney general' situation, courts compensate a private party who brought suit to effectuate a strong legislative policy.") (citation omitted); *Wernke v. Halas*, 600 N.E.2d 117, 123 (Ind.Ct. App.1992) ("There are exceptions [to the American rule] for obdurate behavior, a common fund situation, and private attorney general situations.") (citation omitted); *Estate of Kroslack*, 570 N.E.2d 117, 120 (Ind.Ct.App. 1991); *Highland Realty, Inc. v. Indianapolis Airport Authority*, 551 N.E.2d 1176, 1178 (Ind.Ct.App.1990), *vacated*, 563 N.E.2d 1271 (Ind.1990); *Greensburg Local No. 761 v. Robbins*, 549 N.E.2d 79, 80 (Ind.Ct.App.1990) ("[S]everal exceptions have evolved in recent years . . . [including] where the court compensates a private party who brought suit to effectuate a strong legislative policy (the private attorney general exception).") (citation omitted); *Dotlich v. Dotlich*, 475 N.E.2d 331, 347 (Ind.Ct.App.1985), *trans. denied; City of East Chicago v. Broomes*, 468 N.E.2d 231, 234 (Ind.Ct.App.1984); *City of Logansport v. Remley*, 453 N.E.2d 326, 330 n. 4 (Ind.Ct.App. 1983); *City of Marion v. Antrobus*, 448 N.E.2d 325, 332 (Ind.Ct.App.1983); *Cox v. Ubik*, 424 N.E.2d 127, 129 (Ind.Ct.App.1981) (describing private attorney general exception as

In *Downing v. City of Columbus*, 505 N.E.2d 841 (Ind.Ct.App.1987), *trans. denied*, three police officers, who also were members of the Indiana National Guard, challenged the City's personnel policy which stated that employees on military leave would receive their regular pay less pay received from the military. The trial court granted summary judgment in favor of the City. The Court of Appeals reversed, determining that the plain language of IND.CODE § 10–2–4–3 stated that employees of any municipality shall be entitled to a leave of absence without loss of pay for time spent fulfilling national guard duties. *See id.* at 842. In reaching its conclusion, the Court of Appeals noted that Article XII of the Indiana Constitution provides for a state militia and that the existence of a militia is an "area of interest within which the state is required to act." *Id.* at 844. Military pay for members of the National Guard, the Court of Appeals concluded, is a matter reserved to the State, and the full pay statute in question serves both state and national interests that are more important than local or municipal interest. *See id.* (quoting *Reed v. Tulsa*, 569 P.2d 451, 454 (Okla.1977)).

The Court of Appeals in *Downing*, however, declined to award the police officers attorneys' fees. *See id.* at 845. Although the obdurate behavior and common fund exceptions were "viable" in Indiana, the Court of Appeals asserted that the private attorney general exception has only been identified in dicta and has never been acknowledged by the Indiana Supreme Court or used to support a fees award in Indiana. *See id.* The Court of Appeals noted that the *Saint Joseph's College* opinion relied upon two federal district court opinions in recognizing the private attorney general exception and that the United States Supreme Court in *Alyeska Pipeline* had explicitly declared those two decisions to be erroneous. *See id.* (citing *LaRaza Unida*

*v. Volpe*, 57 F.R.D. 94 (N.D.Cal.1972) and *Sims v. Amos*, 340 F.Supp. 691 (M.D.Ala. 1972)). Both *LaRaza Unida* and *Sims*, the Court elaborated, were class actions in which "plaintiffs sought injunctive or declaratory relief to preserve basic civil liberties or to effectuate public interest litigation." *Id.* The Court indicated that both cases permitted an award of attorneys' fees under the private attorney general exception when nothing in a statutory scheme precluded such an award and when: (1) the party has effectuated a strong Congressional policy; (2) the action has benefited a large class of people; and (3) given the necessity and financial burden of private enforcement, the award is essential. *See id.* (quoting *La Raza Unida*, 57 F.R.D. at 98). In affirming the denial of fees, the Court of Appeals concluded, "We see nothing in the record which would indicate that such an approach would apply in this case." *Id.*

More recently, in *Morgan County v. Ferguson*, 712 N.E.2d 1038 (Ind.Ct.App. 1999), the Court of Appeals again considered the private attorney general exception. In *Ferguson*, Morgan County officials appealed the trial court's award of attorneys' fees and deposition costs in a quiet title action concerning a tract of land purchased by the plaintiff at a tax sale. The trial court ordered that Morgan County pay the attorneys' fees of the two disputing landowners, reasoning that the county was the cause of the error leading to the action. *See id.* at 1044. The trial court in part relied upon the private attorney general exception; it determined that a party should not have to pay attorney's fees to attack a sovereign when the sovereign has committed error. *See id.* The Court of Appeals reversed the award of fees and costs to be paid by Morgan County. *See id.* at 1046. In reaching its deci-

"where the court compensates a private party who has brought suit to effectuate a strong legislative policy") (citation omitted); *Umbreit v. Chester B. Stem, Inc.*, 176 Ind.App. 53, 373

N.E.2d 1116, 1119 (1978) (citation omitted); *City of Indianapolis, Through Dep't of Transp. v. Central R.R. Co. of Indianapolis*, 175 Ind. App. 120, 369 N.E.2d 1109, 1113 (1977).

sion, the Court made the following analysis:

> Indiana recognizes three exceptions to the rule that each party must pay his own attorney fees. These exceptions authorize an award of attorney fees where a party acted in bad faith (the obdurate behavior exception), where the court wants to insure the beneficiaries of an action share the expenses of the action (the common fund exception), and where the court compensates a private party who brought suit to effectuate a strong legislative policy (the private attorney general exception). We have held, however, that the private attorney general exception only applies where the party acting in the private attorney general capacity was authorized to do so by statute. Here, there is no basis for an award of attorney fees or costs. Accordingly, the trial court erred in ordering Morgan County to pay attorney fees and costs on this basis.

*Id.* at 1044–45 (citations omitted).

The *Ferguson* court cites *Downing* to support its assertion that the private attorney general exception applies only where the party was authorized by statute to act in such capacity. *See id.* at 1044 (citing *Downing,* 505 N.E.2d at 845). This is incorrect. The *Downing* court did not reach this conclusion. In *Downing,* the Court of Appeals acknowledged the federal rule prohibiting fees awards, absent statutory authorization, using the private attorney general exception. *See Downing,* 505 N.E.2d at 845. Further, the *Downing* court correctly observed that the Supreme Court in *Alyeska Pipeline* posited that the decisions in *La Raza Unida* and *Sims* erroneously employed the private attorney general exception. *See id. See also Alyeska Pipeline,* 421 U.S. at 270 n. 46, 95 S.Ct. at 1628 n. 46. However, the Court of Appeals in *Downing* merely concluded that

the record did not indicate that the private attorney general exception, as the exception is espoused in *La Raza Unida* and *Sims,* applied to the facts before it. *See Downing,* 505 N.E.2d at 845. The *Downing* court never held that the private attorney general exception applies only where the party acting as a private attorney general is authorized by statute to do so.[7] *Ferguson,* therefore, correctly identifies the private attorney general exception but then misinterprets Indiana precedent in applying the exception to the facts before the Court.

The Indiana Supreme Court has not acknowledged the private attorney general exception to the American rule. The Indiana Court of Appeals has acknowledged the exception on various occasions since 1973. However, the Court of Appeals has never supported an award of attorneys' fees using the exception. These cases offer the Court guidance but do not compel a finding that Indiana courts under no circumstances should apply the private attorney general exception to support an award of attorneys' fees. The Court will therefore examine the approaches to the exception as articulated and applied by other jurisdictions.

### III. States Adopting the Private Attorney General Exception

Certain states allow an award of attorneys' fees pursuant to the private attorney general exception. *Serrano v. Priest,* 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977) is the seminal case adopting the exception. In *Serrano,* plaintiffs' counsel sought to engage the trial court's equitable powers to award attorneys' fees where plaintiffs successfully challenged the constitutionality of the state's public school financing formula. The trial court ordered the state to pay a total of $800,000 in fees pursuant to the private attorney general exception. In affirming the awards, the

---

7. This interpretation is illogical. The American rule itself permits awards of attorneys' fees where authorized by statute; thus, the private attorney general exception necessarily comes into play only when no statute authorizing an award of attorneys' fees applies to the facts before the court.

California Supreme Court first found that the common fund and substantial benefits exceptions did not apply. *See id.* at 1309, 1312.

Next, the Court identified three basic factors to be considered in awarding fees under the private attorney general exception: "(1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, [and] (3) the number of people standing to benefit from the decision."[8] *Id.* at 1314. The Court stated that the public policy at issue was grounded in the state constitution and that the interests furthered by the litigation were "constitutional in stature."[9] *Id.* at 1315. Further, the trial court's findings made it clear that the benefits flowing from the litigation were to be widely enjoyed among the state's citizens and that subsidization of the plaintiff was justified because of the nature of the litigation.[10] *See id.*

A recent decision by the Supreme Court of Montana adopts the approach taken in *Serrano.* In *Montanans for the Responsible Use of the School Trust v. State ex rel. Board of Land Commissioners,* 989 P.2d 800 (Mont.1999), the Court considered in part whether the trial court improperly denied the plaintiff-organization (Montrust) attorneys' fees. Montrust had filed a complaint challenging the constitutionality of fourteen statutes concerning Montana's school trust lands. The trial court permanently enjoined eleven statutes, concluding that ten of the challenged statutes violated the Act of February 22, 1889, ch. 180, 25 Stat. 676 (Enabling Act) and certain provisions of Montana's Constitution. The Supreme Court formally adopted the private attorney general exception and the three-part inquiry outlined in *Serrano. See Montanans,* 989 P.2d at 812. Applying the three basic factors, the Court determined that the trial court had abused its discretion in denying Montrust's request for reasonable attorneys fees. The Court observed:

> First, Montrust has litigated important public policies that are grounded in Montana's Constitution. Second, the State argues that it had a duty to defend the statutes in the present case;

---

**8.** California has codified the private attorney general exception. Effective in 1978, Cal.Civ. Proc.Code § 1021.5 (West 2000) currently provides in part:

> Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any....

**9.** As explained by the Court, though, it is not enough to determine that the public policy vindicated is constitutional; such a determination "simply establishes the first of the three elements requisite to the award...." *Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1315 n. 18. To justify a fees award using the private

attorney general exception, the other two prongs must be shown. *See id.* Further, the Court in *Serrano* expressly declined to consider whether the private attorney general exception could be employed to support an attorneys' fees award where the litigation has vindicated a public policy having a statutory basis. *See id.* at 1315.

**10.** The *Serrano* court also determined that the fees award was not affected by the fact that plaintiffs' attorneys received funding from charitable or public sources. *See Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1316. According to the Court:

> Because the basic rationale underlying the "private attorney general" theory which we here adopt seeks to encourage the presentation of meritorious constitutional claims affecting large numbers of people, and because in many cases the only attorneys equipped to present such claims are those in funded "public interest" law firms, a denial of the benefits of the rule to such attorneys would be essentially inconsistent with the rule itself.
> *Id.*

thus, the State does not dispute the necessity of private enforcement of Montana's Constitution. Nor does the State dispute the magnitude of Montrust's consequent burden. Third, Montrust's litigation has clearly benefited a large class: all Montana citizens interested in Montana's public schools.... In the present case, Montrust has successfully litigated issues of importance to all Montanans and incurred significant legal costs. We conclude that the District Court ignored recognized principles in denying Montrust reasonable attorney fees, resulting in "substantial injustice."

*Id.* The Court adopted the private attorney general exception despite a state statute limiting an award of reasonable attorneys' fees against the state to situations where the court finds that the state's claim or defense was frivolous or pursued in bad faith. *See id.* at 810–11 (citing MONT.CODE ANN. § 25–10–711).

The Supreme Court of Idaho applied the private attorney general theory in *Hellar v. Cenarrusa,* 106 Idaho 571, 682 P.2d 524, 530–31 (1984). In *Hellar,* the Court held that the legislature's reapportionment scheme violated the IDAHO CONST. art. III, § 5, which provides that legislative districts composed of multiple counties shall consist of undivided, contiguous counties. *See id.* at 528. The trial court had granted attorneys' fees pursuant to the three prong inquiry of *Serrano,* finding that: (1) an important public policy (i.e., ensuring constitutional representation) was at issue; (2) without private enforcement, the legislation would not have been challenged; and (3) every Idaho citizen is affected by the litigation. *See id.* at 531.

The fees award was upheld. *See id.* The Court specifically noted that Plaintiffs' counsel was a sole practitioner who endured extensive time and monetary demands to prosecute the case. *See id.* at 530. Further, the Court indicated that Idaho's Attorney General had been asked to defend the disputed apportionment statute; thus, "that office could not provide a defense of either Idaho Const. art. 3 § 5 or the interest of the people of Idaho as that interest has been determined both by the trial court and [the Idaho Supreme Court]." *Id.* The Court approved the fees award, despite language in IDAHO RULES OF CIVIL PROCEDURE 54(e)(1) limiting the discretion of trial courts in awarding fees to those cases brought, pursued or defended frivolously, unreasonably or without foundation. The Court had adopted I.R.C.P. 54(e)(1) as permitted by statute, IDAHO CODE §§ 12–120 & –121. Asserting that it continued to adhere to the American rule, the Court held that the limitation imposed by I.R.C.P. 54(e)(1) did not apply where the fees award is made under the private attorney general exception. *See id.* at 531.

Utah has also recognized the private attorney general exception but limited its application to extraordinary circumstances. In *Stewart v. Utah Public Service Commission,* 885 P.2d 759 (Utah 1994), a group of ratepayers challenged an order issued by the Utah Public Service Commission (Commission) increasing the authorized rate of return on equity for U.S. West Communications, Inc. (USWC). USWC was a regulated public entity that was wholly owned by an unregulated industrial company. Ratepayers also challenged the constitutionality of UTAH CODE § 54–4–4.1(2), which allowed a public utility to reject incentive rate regulation plans approved by the Commission. The Court first found that the order fixed an unlawful rate of return on equity. *See id.* at 773. The Court also found that section 54–4–4.1(2) unconstitutionally delegated legislative powers to a private party. *See id.* at 776–77. Finally, the Court held that the Commission's incentive plan was invalid. *See id.* at 781.

The Utah Supreme Court concluded that the facts warranted an award of attorneys' fees to the ratepayers' counsel. *See id.* at 783. The Court noted that Utah followed the American rule but that, absent a statutory or contractual authorization, a "court

has inherent equitable power to award reasonable attorney fees when it deems it appropriate in the interest of justice and equity." *Id.* at 782. The Court outlined instances when courts have exercised their inherent equitable power, including when applying the private attorney general exception. *See id.* at 782–83 (citing *Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1314). The Court invoked its inherent equitable powers to award attorneys' fees in the case. *See id.* at 783.

The Utah Supreme Court ordered the action remanded to the Commission for a determination of the fees award. *See id.* at 784. The Court required that, if the Commission found that USWC must disgorge overcharges, the Commission was to award attorneys' fees from that fund. *See id.* at 783. If no such fund were created, USWC would be ordered to pay the fees under the private attorney general exception. *See id.* The Court supported its award by reasoning: (1) ratepayers "successfully vindicated an important public policy"; (2) the litigation's outcome would "necessarily benefit all USWC ratepayers in the state of Utah"; and (3) without the ratepayers' action, collections under the unlawful rate of return would have remained unchallenged and no ratepayer "would every have had any relief." *Id.* In reaching its decision, the Court emphasized the fact that the ratepayers, acting entirely on their own, challenged USWC, the Commission, and the Division of Public Utilities.[11] *See id.* However, in a footnote, the Court noted the "exceptional nature" of the case and pointed out that "any future award of attorney fees under [the private attorney general] doctrine will take an equally extraordinary case." *See id.* at 783 n. 19.

The private attorney general theory has not been applied only when constitutional principles are at issue. In *Arnold v. Arizona Department of Health Services,* 160 Ariz. 593, 775 P.2d 521 (1989), the Supreme Court of Arizona considered whether the state and county governments breached a statutory duty to provide mental health care to the chronically mentally ill (CMI patients). Arizona legislation required the Arizona State Hospital, the Arizona Department of Health Services and the Maricopa County Health Department to coordinate their treatment efforts of CMI patients, but the three agencies were found to essentially operate independently. *See id.* at 527. The trial court had entered a detailed order requiring the defendant agencies to provide community mental health services to all CMI patients class members, as prescribed by law. The county argued that it did not have a mandatory, non-discretionary duty to treat all CMI patients; rather, the county maintained that it had a general duty to treat the indigent sick. *See id.* at 531. The Court held that the county, by statute, was required to provide mental health services to the CMI patients. *See id.* at 532. The trial court awarded attorneys' fees to the prevailing party; the court held the county responsible for one-third of the fees award using the private attorney general exception. *See id.* at 536–37.

The Supreme Court of Arizona affirmed the award of attorneys' fees. *See id.* at 537. Noting that Arizona had long recognized the private attorney general exception but not before applied it, the Court officially adopted and applied the exception. *See id.* The Court observed that the decision to adopt the exception involved a choice of two policies—encouraging public interest litigation and preserving the

---

11. In Utah, utilities can only charge those rates found to be "just and reasonable" by the Commission. *Stewart,* 885 P.2d at 771 (citing Utah Code § 54–4–4). As the Court observed, the Commission's role is to "protect the interests of both the ratepayers and the shareholders and to accommodate both those interests to the overall public interest." *See id.* at 776.

In *Stewart,* the Court found it significant that the "Committee of Consumer Services, which by statute is charged with the responsibility of representing consumer interests, made no appearance at all on this appeal and that the Commission and Division of Public Utilities have opposed the ratepayers on all issues." *Id.* at 783.

American rule. *See id.* The Court reasoned that, while longstanding, the American rule had been "eroded" by statute and by state and federal judicial decisions. *Id.* Given this erosion of the American rule coupled with the benefit to state citizens from public interest litigation, the Court deemed adoption of the private attorney general exception to be appropriate. *See id.*

State courts have applied the private attorney general exception under various factual situations to enforce citizens' constitutional and statutory rights against violations of those rights committed by state and local governments and, in Utah, by a regulated public utility.[12] The American rule still prevails in these jurisdictions; the circumstances where the private attorney general exception has been recognized and applied are generally exceptional in nature. In all cases, the award of attorneys' fees using the exception is fact specific. In applying the exception, courts tend to weigh three factors in deciding whether to award fees: (1) the importance of the rights being vindicated; (2) the necessity for private enforcement; and (3) the number of persons potentially benefit-

ing from the litigation's outcome. With this in mind, the Court now examines the rationales of those state jurisdictions declining to adopt and apply the private attorney general exception.

## IV. *States Rejecting the Private Attorney General Exception*

Other jurisdictions have chosen to follow the United States Supreme Court's lead in *Alyeska Pipeline* by rejecting the private attorney general exception in litigation involving both constitutional and statutory rights. A 1999 opinion from the Supreme Court of New Mexico is representative of these cases. In *New Mexico Right to Choose/NARAL v. Johnson,* 127 N.M. 654, 986 P.2d 450 (1999), plaintiffs-advocates cross-appealed the trial court's decision denying them attorneys' fees. The advocates had sought injunctive relief against the state's Secretary of the Human Services Department, alleging that the Department had adopted new rules for its medical assistance program that violated their rights under the state constitution. The Department was enjoined from enforcing its new rules, but the advocates were only awarded costs. At trial, the advocates contend-

12. Petitioners point to two other jurisdictions that have allowed attorneys' fees in public interest litigation, where the courts did not explicitly apply the private attorney general exception but where the courts' theories, according to Petitioners, provide a basis for recognition and application of the exception in the present case. In *Tanner v. Oregon Health Sciences University,* 161 Or.App. 129, 980 P.2d 186, 189 (1999), *review denied,* 329 Or. 527, 994 P.2d 129 (1999), Oregon's Court of Appeals explained that, to obtain an award of attorneys' fees under the Supreme Court of Oregon's decision in *Deras v. Myers,* 272 Or. 47, 535 P.2d 541 (1975), three conditions must be satisfied: (1) the proceeding must be one in equity; (2) the requesting party must have prevailed; and (3) the requesting party must have been seeking to vindicate an important constitutional right applying to all citizens without any gain peculiar to the party. *See id.* (citing *Armatta v. Kitzhaber,* 327 Or. 250, 959 P.2d 49 (1998)). As the Court of Appeals explained, the third condition required that a party seek a "public benefit." *See id.* at 189.

Alabama, in *Shelby County Commission v. Smith,* 372 So.2d 1092, 1096–97 (Ala.1979), explicitly rejected the private attorney general exception, as the exception is adopted in *Serrano.* The Court seems to have at least implicitly reconsidered its rigid position in *Shelby County.* In *Brown v. State,* 565 So.2d 585, 591–92 (Ala.1990), the Supreme Court of Alabama permitted an award of attorneys' fees in a class action challenging class members' convictions for traffic offenses where the members had been issued improperly verified traffic complaints. The Court observed that:

[P]laintiffs have, however, made a significant contribution to the integrity of our system of jurisprudence in calling attention to a serious flaw in its administration.... This litigation clearly resulted in a benefit to the general public. It is unquestionable that plaintiffs' attorneys rendered a public service by bringing an end to an improper practice. The public nature of the services rendered by these lawyers justifies an award of attorney fees.

*Id.* (citing *Callahan v. Wallace,* 466 F.2d 59, 62 (5th Cir.1972)).

ed that they were entitled to fees under the private attorney general exception..

The Court first noted that New Mexico had strictly adhered to the American rule since the state's territorial days. *See id.* at 453 (citations omitted). The Court observed that adoption of the private attorney general exception would be a departure from established precedent and that any departure from precedent required "special justification." [13] *See id.* (citation omitted). This need for a special justification created reluctance on the part of the Court to extend awards of attorneys' fees except in limited circumstances. *See id.* at 454 (citation omitted).

The Court explained that two important policies underlie the American Rule. First, the American rule promotes equal access to the courts for the resolution of bona fide disputes. *See id.* This justification, the Court observed, is rooted in the Founders' deliberate departure from the English practice of awarding attorneys' fees. *See id.* (citation omitted). The Court voiced its unwillingness to move towards a system that might discourage potentially meritorious actions because of high litigation costs; in other words, it reasoned that fee shifting might favor the wealthy and penalize

the poor. *See id.* (citations omitted). Second, the Court rationalized that the American rule tends to preserve judicial resources. *See id.* (citation omitted). More specifically, a rule expanding the court's authority to award attorneys' fees will often require the court to determine what fee is reasonable—an added burden on judicial administration. *See id.* (citation omitted). These policies, the Court asserted, are still important today, and the state's constitutional jurisprudence does not provide a basis for concluding that the American rule is "so unworkable as to be intolerable." [14] *Id.* (citation omitted).

The Court further explained that its past rulings allowing attorneys' fees involved "exceptional circumstances." *Id.* at 455. The Court's recognized exceptions were characterized as "limited in number and narrow in scope" and "appear to be consistent with the policies underlying the American rule." *Id.* The referenced exceptions fell into three categories, encompassing exceptions arising: (1) from a court's inherent powers to sanction the bad faith conduct of litigants and attorneys; [15] (2) from certain exercises of a court's equitable powers; [16] and (3) simultaneously

---

13. In evaluating whether "substantial justification" is present, New Mexico courts consider: (1) whether the precedent was so unworkable that is intolerable; (2) whether parties justifiably relied upon the precedent, so that reversing it would create an undue hardship; (3) whether the legal principles have developed to the extent that the old rule is no more than a remnant of abandoned doctrine; and (4) whether the facts have changed in the interval from the old rule to reconsideration, so that the old rule has been robbed of its justification. *See Johnson,* 986 P.2d at 453–54 (citation omitted).

14. The Court cites to *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967) in describing the purposes behind the American rule. *See Johnson,* 986 P.2d at 454. In *Fleischmann,* the Supreme Court stated:

In support of the American rule, it has been argued that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged

from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel. Also, the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration.

*Fleischmann,* 386 U.S. at 718, 87 S.Ct. at 1407.

15. Inherent powers are those arising from the necessity for both trial and appellate courts to impose a variety of sanctions on both litigants and attorneys for purposes of regulating the courts' dockets, promoting judicial efficiency and deterring frivolous filings. *See Johnson,* 986 P.2d at 455 (citation omitted).

16. In New Mexico, exceptions to the American rule arising under the Court's equitable powers include allowing awards for attorneys' fees when a common fund has been established and when fees are incurred in dissolving a wrongful injunction. *See Johnson,* 986 P.2d at 456–57 (citations omitted).

from judicial and legislative powers.[17] *See id.* The Court concluded that any new exception should be consistent with the policies underlying the American rule. *See id.*

The Court analyzed recognized exceptions to the American rule and concluded that these limited, narrow exceptions appear consistent with the policies underlying the rule. *See id.* at 455–57. In contrast, the Court reasoned that the private attorney general exception is "overly broad and not consistent with those policies." *Id.* at 455. The Court offered several reasons for this conclusion. First, the Court could not justify extending the scope of its inherent powers because applying the private attorney general exception requires courts to "look beyond the proceedings before it to determine which rights are of more societal importance than others" and the advocates did not show that making such "broad determinations" involved powers which could not be dispensed with in court. *Id.* at 458. The Court expressed concerns that it lacked sufficient guidelines to use its inherent powers to create and apply the private attorney general exception. *See id.* Moreover, the Court worried that an "unprincipled use of the doctrine would upset the careful 'balancing of competing public policy concerns' that underlies the American rule and its recognized exceptions." *Id.* (citation omitted). Finally, with respect to expanding the Court's inherent powers, it weighed the necessity of protecting public revenues unless specifically allowed to redirect them by statute. *See id.* The Supreme Court of New Mexico held similar concerns for expanding its equitable powers, noting that the state's

"present case law on equitable exceptions provides no general principle from which we may derive an additional exception that would cover the facts of this case." *Id.* at 459. Concluding its analysis, the Court declined to "adopt a new rule that moves New Mexico courts" towards an English system for awarding attorneys' fees. *Id.* Summarizing, the Court stated:

> Unbridled judicial authority to "pick and choose" which plaintiffs and causes of action merit an award of attorney fees under the private attorney general doctrine would not promote equal access to the courts for the resolution of good faith disputes inasmuch as it lacks sufficient guidelines to prevent courts from treating similarly situated parties differently and could easily result in decisions that favor a particular class of private litigants while unduly discouraging the government from mounting a good faith defense. Such authority also would not promote the goal of conserving judicial resources inasmuch as it calls for the courts to engage in a fact-specific reexamination of the merits of a case to determine the significance and scope of the rights that have been protected.

*Id.* (citations omitted).

In *Doe v. State*, 216 Conn. 85, 579 A.2d 37 (1990), a class of indigent women and physicians prevailed in its challenge to the legality of regulations restricting the funding of abortions under the state's Medicaid program. The trial court found that the regulation exceeded the statutory authority of the commissioner of income maintenance and violated the plaintiffs' due process rights under CONN. CONST. art. I, § 10.[18] Determining that the cited consti-

---

17. As to this third category, the Supreme Court of New Mexico noted that the "recognized exceptions to this category are narrow in scope." *Johnson*, 986 P.2d at 457 (identifying two exceptions, one involving divorce and child custody proceedings and the other involving breaches of fiduciary duties) (citations omitted).

18. This provision provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." The provision originated in the Magna Carta and has been adopted in substantially the same form in the constitutional provisions of most states. *See Doe*, 579

tutional provision authorized a fees award, the trial court awarded the class of indigent women attorneys' fees.

The Court concluded that the state constitution did not create a "right" to attorneys' fees. *See Doe,* 579 A.2d at 47. Therefore, the Court next considered whether an alternative basis, including the private attorney general exception, existed upon which to affirm the fees award. *See id.* The Court asserted that it is "well entrenched" that Connecticut adheres to the American rule. *See id.* It observed that the state legislature has not "chosen to repudiate the American rule, but rather has made specific provisions for attorneys' fees in selected statutes." *Id.* at 48. Thus, the Court concluded that it is "inappropriate for the judiciary to establish under the private attorney general doctrine a broad rule permitting such fees whenever a private litigant has at substantial cost to himself succeeded in enforcing a significant social policy that may benefit others." *Id.* (citation omitted). *Cf. Moore v. City of Pacific,* 534 S.W.2d 486, 504–05 (Mo.App. 1976) (declining to adopt private attorney general exception in disallowing fees award, after concluding that plaintiff made prima facie showing that disputed redistricting ordinance violated constitutional "one man-one vote" principles).

States have also rejected the private attorney general theory when statutory vi-

olations are primarily at issue. The Supreme Court of Illinois dealt with a property taxation case nearly twenty-five years ago in *Hamer v. Kirk,* 64 Ill.2d 434, 1 Ill.Dec. 336, 356 N.E.2d 524 (1976). In *Hamer,* the Court reversed the trial court's award of attorneys' fees in an action brought on behalf of a class of taxpayers and resulting in an order that the Lake County Board of Review equalize the level of assessment for each township in the county. *See id.* at 525, 529. The order came after much protracted litigation, including several prior appeals to the Supreme Court of Illinois. *See id.* at 525 (citing *Hamer v. Lehnhausen,* 60 Ill.2d 400, 328 N.E.2d 11, 13 (1975) (explaining that proceedings related to case had been pending in state courts for past decade and that litigation resulted from failure of state and local officials to produce uniformity in assessments as required by statute)). The Court stated that no authority existed in Illinois to "support an award of attorney's fees solely on the basis of a public interest rationale." *Id.* at 528. Noting that in *Alyeska Pipeline* the United States Supreme Court had held it to be inappropriate to reallocate the burdens of litigation in the manner and to the extent requested, the Court asserted, "We believe that such a determination by this court would be equally inappropriate."[19] *Id.* (citing 421 U.S. at 247, 95 S.Ct. at 1616).

A.2d at 43 (citations omitted). Petitioners assert that Indiana's open court's provision, IND. CONST. art. 1, § 12, which is substantially similar to Connecticut's version, supports adoption of the private attorney general exception. The Court, however, does not believe this provision to be relevant in deciding whether to adopt the private attorney general exception.

19. The Appellate Court of Illinois has recently reaffirmed the *Hamer* decision. In *Fischer v. Brombolich,* 246 Ill.App.3d 660, 186 Ill.Dec. 553, 616 N.E.2d 743 (1993), *appeal denied,* plaintiffs obtained a temporary injunction against the enforcement of a city ordinance transferring control of the police department from the police and fire commissioner to the mayor. The injunction was upheld on appeal and a permanent injunction entered. Plain-

tiffs requested attorneys' fees; the trial court dismissed the request. Plaintiffs urged the Appellate Court to recognize and apply the private attorney general theory. The Court set forth the following reasons supporting its refusal to adopt the exception:

> While adoption of the private attorney general theory may indeed create an environment more conducive to litigation designed to challenge elected officials' questionable conduct, the supreme court has not sanctioned such a theory nor has the legislature created such a fee-shifting statute.... There is no authority to support an award of attorney fees solely on the basis of a public-interest rationale. Further, the supreme court has been reluctant to reallocate the burdens of litigation without legislative guidance. Even the knowledge that

The Supreme Court of Washington rejected the private attorney general exception in *Blue Sky Advocates v. State,* 107 Wash.2d 112, 727 P.2d 644 (1986). In *Blue Sky Advocates,* a group of wheat farmers and citizens (Blue Sky) intervened in administrative proceedings involving site certification for a proposed coal-fired electrical generating facility. Blue Sky raised and expended substantial sums in successfully obtaining a reduction in sulfur dioxide emissions from the project. Blue Sky sued the state to recover its expenses, including attorneys' fees. Over a vigorous dissent, the Court refused to adopt the private attorney general exception. *See id.* at 649 and 649–52 (Dore, J., dissenting). In so doing, the Court adopted the reasoning in *Alyeska Pipeline,* where the United States Supreme Court determined that it was up to Congress and not the judiciary to fashion an exception to the American rule and award fees in some cases but not others.[20] *See id.* at 649 (citing *Alyeska Pipeline,* 421 U.S. at 269, 95 S.Ct. at 1627).

In *Jones v. Muir,* 511 Pa. 535, 515 A.2d 855 (1986), parties challenged the failure by the State of Pennsylvania to implement collection of charges for a special fund designed to provide citizens with medical treatment and rehabilitative services arising from automotive-related injuries. A state statute, 42 Pa. Cons.Stat. § 2503, enumerated nine traditionally recognized bases for awarding attorneys' fees; none authorized a fees award pursuant to the private attorney general exception. *See id.* at 861. The Court noted that the General Assembly had specified in statute numerous circumstances where attorneys' fees awards are permitted, including several "actions to enforce public interest embodied in enactments of the General Assembly." *Id.* at 862 (citing statutes in footnote thirteen dealing with environmental, energy and other concerns). Concluding that the power to authorize the awarding of attorneys' fees rests exclusively with the General Assembly and noting that the legislature had not approved of fees awards under the private attorney general exception, the Court refused to adopt the exception. *See id.* at 862 (citing *Alyeska Pipeline,* 421 U.S. at 269, 95 S.Ct. at 1627). *Cf. Nemeth v. Abonmarche Dev., Inc.,* 457 Mich. 16, 576 N.W.2d 641, 651–53 (1998) (rejecting private attorney general exception absent statutory authorization, where environmental protection statute allowed costs to be apportioned to parties in the "interests of justice"); *Pearson v. Board of Health of Chicopee,* 402 Mass. 797, 525 N.E.2d 400, 403 (1988) (concluding that Court "should not depart from our general rule that each party bears its own legal costs" in reversing trial court's fees award in action by registered voters contesting validity of meetings held in violation of state's open meeting law); *Van Emmerik v. Montana Dakota Utilities Co.,* 332 N.W.2d 279, 284 (S.D.1983) (applying rationale in *Alyeska Pipeline* and following *Hamer* in rejecting private attorney general exception and affirming denial of fees award in class action commenced by taxpayer seeking a refund of sales taxes from state and retailers of utility services), *cert. denied,* 464 U.S. 915, 104 S.Ct. 278, 78 L.Ed.2d 257 (1983); *Providence Journal Co. v. Mason,* 116 R.I. 614, 359 A.2d 682, 688 (1976) (noting that legislature had expressly provided for awarding of attorneys' fees in some cases and that it could but

the litigation was almost certainly brought about by the illegal actions of the individual members of the legislative bodies has been held insufficient to justify fee shifting. *Id.* at 745 (citations omitted).

**20.** The Court in *Blue Sky Advocates* disapproved of the plurality opinion in *Miotke v. Spokane,* 101 Wash.2d 307, 678 P.2d 803, 821–22 (1984), which applied the private attorney general exception to support an award of attorneys' fees to plaintiffs in a public nuisance action seeking an injunction and damages regarding raw sewage that was being discharged into the Spokane River. *Blue Sky Advocates,* 727 P.2d at 649. The Supreme Court of Washington recently reaffirmed its holding from *Blue Sky Advocates* in *City of Seattle v. McCready,* 131 Wash.2d 266, 931 P.2d 156, 161–62 (1997).

had not done so under the state's Fair Employment Practices Act, so that trial court correctly reversed commission's fees award).

■ Courts refusing to adopt the private attorney general exception strictly adhere to the American rule. These courts tend to emphasis the lack of statutory authorization to award fees using the exception. Applying the United States Supreme Court's rationale in *Alyeska Pipeline,* these courts also express reluctance to weigh the relative societal importance of individuals' rights and legislative policies. This reluctance largely stems from a perceived lack of guidance in adjudging the importance of such rights and policies combined with a desire not to interfere with legislative prerogatives. Also, the courts wish to avoid burdening the judicial system with disputes as to what constitutes proper fees. Although these concerns possess merit, the Court will next explain why the private attorney general exception should be recognized, adopted and applied to support an award of attorneys' fees to Petitioners in the present case.

## V. *Adoption and Application of Private Attorney General Exception*

■ The Court finds that it is appropriate, given the extraordinary circumstances of the present case, to award Petitioners attorneys' fees pursuant to the private attorney general exception. Although the Indiana Supreme Court has yet to recognize the private attorney general exception, the Indiana Court of Appeals has recognized the exception no fewer than sixteen times since 1973. As explained *supra,* neither the *Downing* court nor the *Ferguson* court rejected the existence of the exception—only its application to the specific facts under consideration. *See Downing,* 505 N.E.2d at 845 ("We see nothing in the record which would indicate that [the exception] would apply in this case."); *Ferguson,* 712 N.E.2d at 1045 ("Here, there is no basis for an award of

attorney fees or costs."). Heretofore, the exception has never been applied to support an award of attorneys' fees. That fact, however, fails to convince this Court that the exception should never be used as a basis for a fees award. *Cf. Montanans,* 989 P.2d at 811–12 (stating that Court had previously recognized but not applied private attorney general exception); *Arnold,* 775 P.2d at 537 (observing that Arizona had long recognized the private attorney general exception but had not applied it until present case).

■ In deciding whether to apply the exception in the present case, the Court turns to the *Serrano* and *Montanans* decisions, discussed *supra,* for guidance. In its recent *Montanans* opinion, the Supreme Court of Montana adopted the three-factor inquiry announced in *Serrano.* Thus, in deciding whether to apply the private attorney general exception, both states' supreme courts considered: (1) the strength or societal importance of the public policy vindicated by the litigation; (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff; and (3) the number of people standing to benefit from the decision. *See Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1314; *Montanans,* 989 P.2d at 811–12. The Court will examine these three factors as well.

■ Through the efforts of their counsel, Petitioners have vindicated a constitutional principle of substantial importance. The Property Taxation Clause, article X, section I of the Indiana Constitution, calls on the General Assembly to provide by law a "uniform and equal rate of property assessment and taxation," in order to "secure a just valuation for taxation of all property." As our Supreme Court has noted, the Property Taxation Clause requires a system of "assessment and taxation characterized by uniformity, equality, and just valuation based on property wealth. . . ." *State Bd. of Tax Comm'rs v. Town of St. John,* 702 N.E.2d

1034, 1040 (Ind.1998). This provision "establishes mandatory minimum requirements for our system of property assessment and taxation." *Boehm v. Town of St. John,* 675 N.E.2d 318, 324 (Ind.1996) (subsequent history omitted). The Property Taxation Clause thus limits the State's power to tax. According to the Supreme Court, compliance with the clause is subject to judicial review; therefore, the "State Board's assessment regulations must be based on objectively verifiable data to enable review of the system and to ensure that it generally provides for uniformity and equality based on property wealth." *Town of St. John,* 702 N.E.2d at 1042.

The private attorney general exception promotes vindication of important public rights. In *Serrano,* the Supreme Court of California affirmed the lower court's determination that the state's public school financing system violated state constitutional provisions guaranteeing equal protection of the laws. *See Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1304. In *Montanans,* the Supreme Court of Montana found that the State, as trustee of lands granted it by the federal government to benefit "common schools," had violated certain state constitutional provisions regarding administration of the trust lands. *See Montanans,* 989 P.2d at 805–10. *See also Hellar,* 682 P.2d at 531 (noting trial court's conclusions, as to legislative reapportionment scheme, that "there may be no greater public policy" than insuring proper representation); *Stewart,* 885 P.2d at 776–77 & 783 (finding statute unconstitutionally delegated legislative powers to a private party and that ratepayers "have successfully vindicated an important public policy"). As did the courts in *Serrano* and *Montanans,* this Court finds that an important policy, one "grounded in" the state constitution, has been litigated by Petitioners. *Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1315; *Montanans,* 989 P.2d at 812. The Property Taxation Clause expresses a cornerstone principle in Indiana taxation law: the State may not arbitrarily assess property. Petitioners sought to enforce this principle. Thus, they successfully litigated a public policy of substantial importance.

Enforcement of the Property Taxation Clause required private litigation that resulted in a significant burden on Petitioners' time and resources. In the present challenge, the Attorney General of Indiana has represented the Respondent State Board throughout this litigation. The Attorney General has been obligated to defend the State Board's unconstitutional system at every step. Thus, public enforcement of the Property Taxation Clause's mandate for a uniform, equal and just assessment system has been impossible. *See Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1315 n. 20 (noting trial court's finding that neither California Attorney General nor any other governmental counsel could reasonably have been expected to institute litigation); *Montanans,* 989 P.2d at 812 (pointing out State's argument that it had a duty to defend disputed statutes); *Hellar,* 682 P.2d at 530 (observing that Idaho Attorney General had been asked by legislature to defend unconstitutional reapportionment scheme, so that the office could not defend either the constitutional provision at issue or the "interest of the people"); *Stewart,* 885 P.2d at 783 (noting significance of fact that committee responsible for representing consumer interests made no appearance in case and that public service commission and division opposed ratepayers on all issues).

The burden on Petitioners' time and resources in prosecuting their constitutional challenge over the past seven years has been immense. The breadth of litigation in the present case has been vast. The Attorney General has vigorously defended the State Board's unconstitutional system from the inception of this litigation. As Petitioners note, they have been required to litigate a motion to dismiss, a seven day trial, an appeal to the Indiana Supreme Court, a remand to this Court, a second appeal to the Supreme Court and another

remand to this Court. (Br. of Pet'rs in Supp. of Att'ys' Fees at 27–28.) Due to the State Board's inability to promulgate constitutional regulations to date, Petitioners have been forced to continue petitioning this Court for appropriate relief. Moreover, following this Court's order of May 31, 2000, Petitioners' involvement in this case will likely continue for at least two more years. *See Town of St. John v. State Bd. of Tax Comm'rs,* 729 N.E.2d 242, 246 (Ind. Tax Ct. 2000) (ordering all assessments in Indiana be made under constitutional regulations as of March 1, 2002 and allowing Petitioners to respond to State Board's monthly progress reports). The record in this case, including all evidence submitted at trial, transcripts and briefs by the parties, is extensive and demonstrates a great number of hours of work on the part of Petitioners' counsel. The not-for-profit Indiana Civil Liberties Union (ICLU) and four private "cooperating attorneys" represent Petitioners; they have collected no fees from their clients but have incurred more than $60,000 in out-of-pocket expenses. (Reply Br. of Pet'rs in Supp. of Att'ys' Fees, Attach. 4) (Aff. of Kenneth Falk ¶¶ 5 & 6.)

The State Board unconvincingly dismisses the magnitude of Petitioners' burden. It argues that Petitioners undertook this litigation with no expectation of payment under the private attorney general exception. Further, the State Board asserts that the "private economic interests that will benefit" from the result of this litigation could have prosecuted the case. (Resp't Br. Opp'g Att'ys' Fees at 17.) According to the State Board, these groups, had they brought the present case, could have financed it. The State Board argues that most claims challenging the state constitution will involve related federal constitutional claims, so that recovery under of fees under 42 U.S.C. § 1988 possibly will be available. Finally, the State Board maintains that Indiana constitutional law has advanced adequately without a need for fee shifting.

None of these arguments seriously refutes the enormity of Petitioners' burden in the present case, as that burden has developed. At the time this case was filed, Indiana's appellate courts had recognized the private attorney general exception on several occasions. More importantly, though, regardless of Petitioners' anticipated basis for requesting fees at the inception of this litigation, they could not have known or fully appreciated at the time of filing the burden they would face in combating the State Board's fervent and protracted defense of its unconstitutional system. The Court focuses on the actual, great burden faced by Petitioners, not the imagined burden of any for-profit entity that could have shouldered the expenses of this litigation. In addition, the State Board does not take into account how for-profit entities may opt to avoid costly litigation by using their resources to force the State Board to bargain and reach a mutually agreeable conclusion as to assessment and taxation issues. The Court declines the State Board's invitation to speculate on future state constitutional challenges by unknown parties and whether those actions will make federal constitutional claims. Similarly, the Court is not concerned with how litigants in other, recent cases have advanced constitutional claims; the State Board fails to show how these cases are pertinent to the facts and issues at hand, beyond placing the cases in the general category of "constitutional." (Resp't Br. Opp'g Att'ys' Fees at 18.)

Although the ICLU was financially supported by private interests to a limited extent, that support was minimal. (Reply Br. of Pet'rs in Supp. of Att'ys' Fees, Attach. 1) (Dep. of Sheila Kennedy at 18) (noting that ICLU received approximately $20,000 from two private groups). According to Petitioners, the proceeds from fundraising "came no where close to covering the out of pocket expenses incurred." (Reply Br. of Pet'rs in Supp. of Att'ys' Fees at 16). *See id.,* Attach. 4 (Aff. of Kenneth Falk ¶ 7) ("The funding of the

[ICLU] is such that it can not assume this financial burden for cases."). *Cf. Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1315 n. 20 (noting trial court's finding that plaintiffs individually had insufficient resources to retain counsel to vindicate rights to equitable educational and taxation systems); and *Hellar,* 682 P.2d at 530 (noting that plaintiffs' counsel was subjected to extensive time demands and was forced to borrow money to meet his office obligations during litigation). The ICLU and its cooperating attorneys were faced with a great burden, as to the protracted litigation in this case. To dismiss that burden now would trivialize the efforts of counsel in enforcing the state constitution and would ignore the fact that, in many instances, only public interest firms or entities are prepared for and willing to challenge constitutional violations. *See Serrano,* 141 Cal.Rptr. 315, 569 P.2d at 1316 (stating that denial of fees to attorneys in public interest firms would be "essentially inconsistent" with the private attorney general exception).

Additionally, the Indiana Supreme Court's opinion of December 4, 1998 underscores the need for private enforcement in this case. In its opinion, the Supreme Court concluded that the Property Taxation Clause does not "create a personal, substantive right of uniformity and equality.... It does not establish an entitlement to individual assessments for abstract evaluation of property wealth, nor does it mandate the consideration of independent property wealth evidence in individual assessments or tax appeals." *Town of St. John,* 702 N.E.2d at 1040. Thus, taxpayers have no constitutional right to produce evidence to the State Board at the administrative level that their individual properties, when compared to similar properties, are not fairly and equitably assessed. Without this opportunity, individual taxpayers are seriously prejudiced in their ability to successfully challenge the constitutionality of their assessments under the Property Taxation Clause and will have to make a Herculean effort to do so. As Petitioners observe, "the only way that

this unconstitutionality can be raised is through a global attack on the total system of taxation itself. The rights in this case must, necessarily, be enforced by citizens who are complaining not about their own personal situations, but about the total system." (Br. of Pet'rs in Supp. of Att'ys' Fees at 27.) In fact, this Court in its order of April 23, 1999 dismissed Petitioners' individual claims for their individual properties in this case, stating that the "Constitution does not prescribe any one single assessment system, so no individual has an entitlement under Article 10, § 1 to any particular assessment or assessment methodology." This being the case, Petitioners were obligated to attack the constitutionality of the State Board's assessment system in its entirety—a task that could not be accomplished without the expenditure of a great deal of time and resources. The Court finds that there was need for private enforcement in the present case and that Petitioners incurred a considerable burden in enforcing their constitutional rights.

The Court finds that all Indiana citizens, either directly or indirectly, stand to benefit from this litigation's outcome. The new regulations will directly impact the three million Indiana real property taxpayers, whose properties will be assessed under a constitutional system based on objectively verifiable data. The new regulations will lead to uniformity and equality of assessments throughout Indiana. Homeowners, businesses and local government entities, including schools, that rely upon property taxes for support will benefit from the elimination of arbitrary assessment practices. Even the State Board, through its Commissioner, has admitted that the ability to judge whether various classes of property are being treated equally and fairly is a benefit to all citizens and all taxpayers of Indiana. (Reply Br. of Pet'rs in Supp. of Att'ys' Fees at 12) (citing Attach. 2, Dep. of Timothy Brooks, at 24–25.) Petitioners correctly list several benefits of this litigation: (1) an end to arbitrary

assessments; (2) abandonment of a self-referential system in favor of one using objectively verifiable data; (3) greater accuracy of assessments; (4) equality of assessments among various jurisdictions throughout the state; (5) equality of taxation among various classes of property; (6) improved assessment appeals; and (7) equity for taxing bodies. (Br. of Pet'rs in Supp. of Att'ys' Fees at 4–11.) The far-reaching impact of this litigation cannot be questioned; virtually all Indiana citizens will benefit from this litigation. *Cf. Serrano,* 569 P.2d at 1315 n. 19 (noting trial court's finding that litigation protected rights of every California child); *Montanans,* 989 P.2d at 812 (stating that litigation benefited "all Montana citizens interested in Montana's public schools"); *Hellar,* 682 P.2d at 531 (noting trial court's finding that "every Idaho citizen" affected by reapportionment of state legislature); and *Stewart,* 885 P.2d at 783 (concluding that "results achieved by ratepayers will necessarily benefit all [of utility's] ratepayers in the state of Utah").

Having examined the three-prong inquiry of *Serrano,* the Court finds that each factor has overwhelmingly been met in the present case. A strong public policy has been vindicated. A need for private enforcement is present and the burden on Petitioners to prosecute this case has been tremendous. Finally, a great number of persons across Indiana will benefit from the outcome of this litigation. Thus, a fees award pursuant to the private attorney general exception is appropriate in the present case.

■ However, the State Board disagrees, making several arguments. The

State Board invokes sovereign immunity principles in opposing the adoption and application of the private attorney general exception as a basis for a fees award.[21] It cites article X, section three of the Indiana Constitution, which provides, "No money shall be drawn from the Treasury, but in pursuance of appropriations made by law." According to the State Board, the General Assembly has defined many ways in which citizens may obtain compensation from the State Treasury, and this Court should not create a new, common law method for litigants to access the State Treasury.

■ Claims of sovereign immunity will not prevent Petitioners from recovering reasonable attorneys' fees where the private attorney general exception can be appropriately applied. The State may not invoke sovereign immunity to shield it from all claims against it in all cases. For example, the Indiana Supreme Court in *Campbell v. State,* 259 Ind. 55, 284 N.E.2d 733, 737 (Ind.1972) limited the defense in tort cases, holding that it is "not available to any greater extent than is now available to municipal corporations and counties of this state." The Indiana Supreme Court recently reaffirmed its *Campbell* decision in *Benton v. City of Oakland City,* 721 N.E.2d 224, 230 (Ind.1999).[22]

Sovereign immunity is a limited, yet viable doctrine. Our Supreme Court has held that, based on sovereign immunity principles, the "State is not liable for interest on payments due unless it binds itself by contract or statute to pay [pre-judgment] interest." *Indiana Dep't of Pub. Welfare v. Chair Lance Serv., Inc.,* 523 N.E.2d 1373, 1379 (Ind.1988). However, even where pre-judgment interest is concerned, the

---

**21.** Sovereign immunity developed in England as a common law doctrine founded on the substantive principle that "the king could do no wrong" and the procedural notion that the king, as sovereign, was not subject to suit in his own court. *See State v. Rendleman,* 603 N.E.2d 1333, 1335 (Ind.1992).

**22.** The General Assembly has the authority to determine the nature and extent of the immu-

nity of governmental units as regards tort claims. *See Benton,* 721 N.E.2d at 232. The Indiana Tort Claims Act [ITCA], IND.CODE ANN. §§ 34–13–3–1 to 25 (West 1999), was enacted as a response to the *Campbell* opinion and "established extensive immunity provisions which shield governmental units from [tort] liability...." *Benton,* 721 N.E.2d at 232.

Supreme Court has acknowledged an exception, i.e., "interest on amounts unlawfully exacted as taxes and paid under protest." *Id.* at 1379–80 (citing *Metropolitan Life Ins. Co. v. State*, 194 Ind. 657, 144 N.E. 420 (1924)).

 Moreover, to support its sovereign immunity argument, the State Board correctly acknowledges that, as a general rule, equitable estoppel will not be applied against governmental authorities. (Resp't Br. Opp. Att'ys' Fees at 11)(citing *Indiana Dep't of Envtl. Mgm't v. Conard*, 614 N.E.2d 916, 921 (Ind.1993); *U.S. Outdoor Advertising Co. v. Department of Transp.*, 714 N.E.2d 1244, 1257 (Ind.Ct.App.1999)). Equitable estoppel is a doctrine "by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right he otherwise would have." BLACK' S LAW DICTIONARY 373 (6th ed. abr.1991). The party claiming equitable estoppel must show: "(1) lack of knowledge and of the means of knowledge as to the facts in question; (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially." *U.S. Outdoor Advertising*, 714 N.E.2d at 1259 (quotations omitted). However, as the Court of Appeals has pointed out, application of equitable estoppel to government entities "is not absolutely prohibited." *Id.* at 1260 (citing *City of Crown Point v. Lake County*, 510 N.E.2d 684, 687 (Ind.1987)). Indeed, this Court has likewise acknowledged the limited application of equitable estoppel to government entities but implied that the doctrine could be used where there is "clear evidence that [the government's] agents made representations upon which the party asserting estoppel relied." *West Publ'g Co. v. Indiana Dep't of Revenue*, 524 N.E.2d 1329, 1333 (Ind. Tax Ct.1988). Thus, although the principle of sovereign immunity

limits application of equitable estoppel to governmental entities, it does not absolutely bar its use. Where the facts clearly support application of the doctrine, it can and should be applied to governmental entities. A similar conclusion can be drawn with the private attorney general exception. Where the facts support application of the exception, application against the State may be permitted at the Court's discretion.

As with most jurisdictions rejecting the private attorney general exception, the State Board argues that fee-shifting is a legislative matter, that the General Assembly knows how to and has enacted numerous fee-shifting statutes and that adopting the exception will result in problematic ranking of rights between allegedly fee-meriting and non-fee-meriting claims. (Resp't Br. Opp. Att'ys' Fees at 12–17.) *See, e.g., Johnson*, 986 P.2d at 458 (expressing concerns that guidelines for private attorney general exception were vague, that legislature had established public policy as to fees awards in certain civil rights cases and that public revenues must be protected); *Doe*, 579 A.2d at 48 (concluding that it is inappropriate to allow fees award under private attorney general exception, where legislative policy was to select situations where such awards are appropriate); *Blue Sky Advocates*, 727 P.2d at 649 (adopting reasoning from *Alyeska Pipeline* that courts are not free to "pick and choose" among claims meriting a fees award, based upon the court's assessment of a public policy's importance); and *Nemeth*, 576 N.W.2d at 653 (observing that legislature "knows how to provide for attorney fees when enacting a statute and has done so on many occasions") (citations omitted). The General Assembly has provided for fee shifting in several statutes.[23] (Resp't Br. Opp. Att'ys' Fees at 15.) Moreover, the "obdurate be-

**23.** For example, IND.CODE ANN. §§ 34–52–2–1 to –6 (West 1999) governs fees awards by courts reviewing final orders by state agencies made pursuant to the Administrative Orders and Procedures Act. To review a representa-

tive list of attorneys' fees statutes pertinent to contract litigation, see James P. Nehf, *Contract Damages as Substitute for Full Performance*, 32 IND. L.REV. 765, 778–79 (1999).

havior" exception has essentially been codified at IND.CODE ANN. § 34–52–1–1 (West 1999).[24] In addition, as the State Board indicates, IND. T.R. 23(D), which governs class actions, implicitly endorses the common fund exception.[25]

The Court is not precluded from allowing fees in some circumstances simply because the General Assembly has chosen to permit fee shifting under other circumstances. As in Arizona, where the Supreme Court identified at least seventy-three statutes providing for fee shifting, this Court notes that Indiana's fee shifting statutes, together with the obdurate behavior and common fund doctrines, have "eroded" the American rule's status in this state. *See Arnold*, 775 P.2d at 537. Drawing a parallel between Indiana Code 34–52–1–1 and Idaho Rule of Civil Procedure 54(e)(1), both of which basically restrict awards to bad faith behavior, the Court agrees with the conclusion of the Supreme Court of Idaho that application of the private attorney general exception is not limited by such a restricting provision. *See Hellar*, 682 P.2d at 531. *See also Montanans*, 989 P.2d at 810–12 (noting that trial courts have discretion in awarding fees to "make an injured party whole" and adopting private attorney general exception, despite statute limiting fees award against state to situations where state's

actions were frivolous or done in bad faith). Further, Indiana does not have a cost statute similar to that discussed in *Alyeska Pipeline*, which statute dated back to 1853. It was this statute, in its original and subsequent forms, which the Supreme Court relied upon to a large degree in rejecting the private attorney general exception. Thus, Indiana lacks the same historical legislative grounds for refusing to apply the exception. Moreover, the General Assembly cannot envision every possible instance where a fees award may be appropriate. The presence of various provisions for fee shifting does not manifest an intent by the General Assembly to forbid a fees award in all cases; thus, the Court finds that it may justify a fees award pursuant to the private attorney general exception.

■ The Court need not worry about the burdens of weighing the importance of different public interests or fear the loosed "dogs" of litigation predicted by the State Board. (Resp't Br. Opp. Att'ys' Fees at 16.) As did the Supreme Court of Utah in *Stewart*, 885 P.2d at 783 n. 19, this Court, in "holding that the private attorney general doctrine applies here, [ ] note[s] the exceptional nature of this case.... [A]ny future award of attorney

**24.** Section 34–52–1–1(b) provides:
In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:
(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or
(3) litigated the action in bad faith.
Also note, IND. APPELLATE RULE 66(E) (effective Jan. 1, 2001) permits the Court on appeal to "assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees."

**25.** IND. T.R. 23(D) states in part: "The court shall allow reasonable attorney's fees and rea-

sonable expenses incurred from a fund recovered for the benefit of a class under this section and the court may apportion such recovery among different attorneys." Trial rules, of course, are creatures of the Supreme Court, not the General Assembly. *See Humbert v. Smith*, 655 N.E.2d 602, 604 (Ind.Ct. App.1995) ("The Indiana Supreme Court has the inherent power to establish rules governing the course of litigation in our trial courts."), *aff'd*, 664 N.E.2d 356 (Ind.1996); *see also* IND. T.R. 80(D) (providing procedure for amending rules). The State Board points to no statute that similarly applies common fund principles. Thus, the General Assembly has not positively expressed a position as to the common fund doctrine. *But cf. Johnson*, 986 P.2d at 457 (noting that recognized equitable exceptions could be traced back to either a statute or a court rule, so they were not contrary to the American rule).

fees under this doctrine will take an equally extraordinary case." This reservation should hold the menacing hounds at bay; while not necessarily limiting its decision to successful vindication of important rights under the constitution, this Court will insist that future litigants requesting attorneys' fees under the private attorney general exception show that equally extraordinary circumstances, when considered in their totality, are present. In making future decisions, the Court will not be without sufficient guidelines. The three-part inquiry, as used in *Serrano* and *Montanans,* provides meaningful direction when examining the particular facts of a case to decide whether the exception is applicable. The Court should not and will not deny an appropriate fees award in the present case simply out of fear that it will be asked to exercise its analytical skills in future cases to determine whether those particular cases reflect equally extraordinary circumstances.

Finally, the State Board contends that, even if the private attorney general theory is recognized and adopted by this Court, it does not apply in this case. The State Board supports its position with several arguments. First, it claims that that residential property taxes will increase because of this case. According to the State Board, the new assessment regulations resulting from this litigation will ultimately shift the tax burden from businesses to homeowners. Thus, the State Board maintains that the "general public," which it characterizes as "residential property owners," will pay higher taxes, and it is the general public that should benefit under the private attorney general exception. (Resp't Br. Opp. Att'ys' Fees at 25.) Second, the State Board argues that the present litigation will spawn additional litigation over the legality of the rules governing the next reassessment, and taxpayers will have to pay for this litigation as well. Third, the State Board, while admitting that this "litigation will lead to a more transparent property tax assessment system," contends that the same citizens

whose taxes will pay the attorneys' fees will be paying higher taxes as a result of this litigation. (Resp't Br. Opp. Att'ys' Fees at 26.)

■ The Court will not repeat its earlier discussion of the benefits of this litigation but will simply note that a constitutional taxation and assessment system will benefit all real property taxpayers—both business and residential property owners. The Court declines the State Board's invitation to pit one group of taxpayers against another. While tax burdens will likely shift and residential taxpayers may have to pay higher property taxes as a result of this litigation (a speculative assertion), taxpayers do not have Petitioners to blame. As this Court has previously noted, "the State Board does not know how to measure equality of taxation among the various classes of property, [so] for over thirty years no measurement of equality has been undertaken." *Town of St. John v. State Bd. of Tax Comm'rs,* 690 N.E.2d 370, 376 (Ind. Tax Ct.1997), *rev' d in part, aff'd in part,* 702 N.E.2d 1034 (Ind.1998). Blame lies squarely with the party in the best position to fix the longstanding unconstitutional system—the State Board. As the Court stated in its hearing on April 28, 2000, "The Constitution is what forms the foundation for our system of government, and if we're to have a government of laws and not of men it can never be too expensive to follow the Constitution. The cost of doing otherwise is too dear." (H'rg Tr. at 60.) To borrow a phrase from the Supreme Court of Arizona, in determining that the State Board has a duty to develop a constitutional system for taxation of real property, the "duty may well be more expensive in the breach than in the fulfillment." *Arnold,* 775 P.2d at 538. In other words, the detriment to taxpayers of continuing to deal with an unconstitutional assessment system is more expensive, in time and resources, than fixing the problem. As the Court noted in its order and judgment entry of March 2, 1998 (as clarified April 2, 1998), "In our legal system,

constitutional rights are a categorical imperative." *Town of St. John v. State Bd. of Tax Comm'rs*, 691 N.E.2d 1387, 1389 (Ind. Tax Ct.1998), *rev'd* 702 N.E.2d 1034 (Ind.1998) (reversing Tax Court's order to consider "all competent real world evidence" on or after May 11, 1999). The Court, therefore, will not hear the State Board to complain that the very taxpayers who have been suffering under the present system for so long will be further harmed by paying to correct the State Board's costly mistakes.

■ A fees award is not inconsistent with Indiana precedent. The exception is intended to promote meritorious public interest litigation, either constitutional or statutory. *See Serrano*, 141 Cal.Rptr. 315, 569 P.2d at 1316; *Arnold*, 775 P.2d at 537.[26] The Court has previously discussed how the public's interest is advanced by this litigation. Further, Indiana has recognized the exception for almost three decades. This case represents the first application of the exception to support a fees award in Indiana. If no Indiana court had previously recognized the exception, this Court perhaps would have deemed the exception unavailable at this time to support a fees award. This is not the case. As the Supreme Court has posited, the common law is not a "frozen mold of ancient ideas, but such law is active and dynamic. . . ." *Sandy Ridge Oil Co. v. Centerre Bank Nat'l Ass'n*, 510 N.E.2d 667, 670 (Ind.1987) (quoting *Perkins v. State*, 252 Ind. 549, 554, 251 N.E.2d 30, 33 (1969)) (responding to certified question from federal court). The common law "must keep pace with changes in society." *Id.* (*quoting Troue v. Marker*, 253 Ind. 284, 290, 252 N.E.2d 800, 804 (1969)).[27] The Court's decision today does not run afoul of established precedent; it reflects the logical refinement of

the common law exceptions to the American rule to meet society's need to promote public interest litigation.

■ The Court's ruling also does not undermine the purposes for the American rule. The Court's decision does not discourage meritorious litigation on the part of poor taxpayers who may fear being forced to pay their opponents' fees. The private attorney general exception is typically applied against government entities that fail to protect the important rights of citizens. *But cf. Stewart*, 885 P.2d at 762 (fees awarded against regulated public utility). That is the situation before the Court, and the Court has limited application of the exception to situations where petitioners demonstrate the presence of extraordinary circumstances. A group of taxpayers challenging the constitutionality of state regulations is in no danger of being forced to pay the State's attorneys' fees under the exception, as the state necessarily acts through the public's Attorney General to enforce and defend the constitution. Thus, if anything, the Court's ruling today promotes meritorious litigation by those who otherwise may not be able to afford to enforce their constitutional rights.

The State Board can still be expected to mount meritorious defenses to constitutional challenges. In the present case, this Court noted that the State Board had not been able to measure equality of taxation among the various classes of property for more than thirty years, yet insisted throughout the course of this litigation that its regulations did not violate the Property Taxation Clause. *Town of St. John*, 690 N.E.2d at 376. That hopefully will no longer be the case once the State Board promulgates new, constitutional

---

**26.** *See* Carl Cheng, *Important Rights and the Private Attorney General Doctrine*, 73 CAL. L.REV.1929, 1931 (1985) ("The doctrine was further supported by the policy of encouraging public interest litigation by shifting costs away from interests which otherwise could not afford to be represented in courts.").

**27.** Indiana does not require a court to find "substantial justification," based on one of four considerations; in recognizing the expansion of common law doctrines, as does New Mexico. *See Johnson*, 986 P.2d at 453–54.

regulations. Then, the State Board likely can justifiably oppose constitutional attacks. Moreover, given the Court's limits on application of the exception, the Court does not expect that its resources will be subjected to a substantial burden in deciding an appropriate fees award pursuant to the exception. Further, as indicated *supra*, the Court should and does not shirk its responsibility for deciding such matters. After all, the Court would have to expend resources in determining appropriate fees under the other recognized exceptions to the American rule. In short, determining fees is part of the Court's basic function.

## CONCLUSION

Indiana recognizes the private attorney general exception to the American rule. The Court considers the three-factor inquiry provided for in *Serrano* and *Montanans* in deciding whether to award fees using the exception. The Court finds that, given the extraordinary circumstances of this case, a fees award is both appropriate and justified. Therefore, the Court hereby ENTERS FINAL JUDGMENT pursuant to IND. T.R. 58 and ORDERS the State Board to pay reasonable attorneys' fees and costs to Petitioners' counsel.

Petitioners shall submit their proposed fees award to the Court on or before thirty days from the date of this Order. Respondent shall have thirty days from Petitioners' filing to respond. Petitioners thereafter shall have fifteen days to submit their reply.